UNION PRODUCING COMPANY,
Plaintiff

v.

J. Virgil SCOTT et al., Defendants.
Civ. A. No. 1079.

United States District Court
S. D. Texas,
Brownsville Division.
June 18, 1958.

Vinson, Elkins, Weems & Searls,
Thomas Fletcher, James W. McCartney,
Houston, Tex., for plaintiff.

George G. Clifton, San Antonio, Tex., for defendants, Parmelee Group.

Morrison, Dittmar, Dahlgren & Kaine, John H. Dittmar, San Antonio, Tex., for defendants, Nueces Royalty Group.

Ewers, Cox & Toothaker, Malcolm McDermott, McAllen, Tex., for defendants, Etchison Group.

W. Sears McGee, Fulbright, Crooker, Freeman, Bates & Jaworski, Austin C. Wilson, Houston, Tex., for defendants, Scott Group.

W. S. Stovall, San Antonio, Tex., pro se.

ALLRED, District Judge.

Interpleader action by plaintiff Union Producing Company, (hereafter called Union), a Delaware corporation, against defendants, all resident citizens of Texas. Plaintiff is the owner of an oil and gas lease on certain lands in Hidalgo County, executed by the defendant Parmelee and Etchison groups on July 29, 1954. Plaintiff also holds a co-owner's lease agreement executed by W. S. Stovall, the owner of an undivided interest in the minerals, on August 6, 1950.

The lease was for a paid-up primary term of five years from December 13, 1954, "and as long thereafter * * * as gas * * * is produced * * * or any of the obligations or conditions * * * in lieu of production are fulfilled." [1] It contained a shut-in gas well provision reading as follows:

"While gas or condensate from a gas well is not sold or utilized off the premises Lessee may pay or tender to Lessor or to the credit of Lessor in the depository Bank named below, at the rate of $1750.00 per year, payable quarterly, and due on or before the last day of each quarter for such time as said gas or condensate is not sold or utilized off the premises, *and upon such payment by Lessee to Lessor it will be considered that gas is being produced from said land. If gas or condensate from* *any gas well is not sold or utilized off the premises for a period of three (3) months or more after the completion of such well, it is agreed that for the purposes of the payments above referred to the quarterly period shall commence on the date of completion of such well; * * * *"*.

On October 23, 1955, Union completed a gas well on the leased premises. A second well was completed December 2, 1955. These wells were capable of producing gas in commercial quantities but were shut in immediately upon completion and no oil or gas was actually physically produced, stored, sold, or marketed, until April 4, 1956, at which time marketing began and has since continued.

On January 17, 1956, Union tendered to defendant Claire H. Parmelee a check payable to the Parmelee-Etchison group and W. S. Stovall jointly, in the sum of $437.50, in full payment of so-called "shut-in" royalties from the period October 23, 1955 to January 23, 1956. This tender was refused by Claire H. Parmelee. However, in this action no defendant contends, *as against Union,* that Union's lease is not in good standing.

The controversy here is between the owners of fractional mineral interests claiming under *term mineral grants,* on the one hand, and the Parmelee and Etchison groups, on the other hand, claiming as *reversioners* that the term mineral interests had terminated. This precipitated this interpleader action by Union to determine who is entitled to the royalties.

In 1935, prior to the execution of Union's present lease and prior to the conveyances of fractional interests to her co-lessors, defendant Claire H. Parmelee's predecessor in title, (Emma B. Hammond), had granted to various persons term mineral interests in the lands covered by the lease. The grantees and assignees of these fractional term mineral interests constitute the remaining defendants except defendant W. S. Sto-

---

1. Emphasis supplied throughout this memorandum unless otherwise indicated.

vall who acquired his mineral rights by deed from defendant Claire Parmelee (then Savage), January 10, 1950; and practically the same fractional interest by a mineral deed dated August 6, 1954, effective only in the event, and upon termination, of the first grant. The original mineral deeds of 1935 contained the following provisions:

"It is further agreed and herein stipulated that in case there is no *paying production* on said land on or before *April 25, 1955, and 'for six months thereafter,* that this grant shall become null and void, and the minerals hereby conveyed shall revert to said Grantor, her heirs and assigns, but should there be such production, then and in that event, this grant shall remain in full force and effect until such production ceases, after which this instrument shall become null and void.

"It is further agreed that Grantee shall have One-half (½) interest in any bonus money received by the Grantor in any future lease or leases given on said land; and that it shall not be necessary for the Grantee to join in any such lease or leases so made;".

Stovall's mineral deed contained practically the same provision as to termination in the event of no paying production as did the two mineral deeds of 1935. There was no provision, however, in Stovall's deed, as in the others, that it would not be necessary for him to join in any lease of the land. Apparently for this reason he executed a "co-lessor's agreement" on August 6, 1954, after the lease from the Parmelee-Etchison group dated July 29, 1954, but before it was filed for record. This lease was amended as to acreage only on August 9, 1954, in an instrument signed by the Parmelee-Etchison group and Stovall, which referred to Stovall's "co-lessor's" agreement as covering all his interest in the minerals. This instrument expressly "ratified, confirmed and adopted" the original lease executed by the Parmelee-Etchison group on July 29th.

None of the term mineral interest holders joined in the lease. Apparently all parties treated the provision that "it shall not be necessary for the Grantee to join in any lease or leases" as granting exclusive leasing powers to the owners of the reversionary interests since the Parmelee group made payment to the term mineral interests for their proportionate share of the bonus paid by Union for the lease.

Union commenced drilling operations on the Parmelee lands on or about September 16, 1955, which resulted in the first shut-in gas well on October 23, 1955. Just prior to the commencement of these operations, ratification instruments were executed by defendants Smith and Scott (dated August 27 and September 1, 1955, respectively), owners of fractional term mineral interests. Ratification instruments were also executed by other defendant mineral interest holders under dates of September 21, 1955, February 10 and February 17, 1956.

All groups of defendants, excepting Stovall and two others who have disclaimed, have filed motions for summary judgment. Some affidavits have been filed. There seems to be no dispute as to any material fact.

The Parmelee-Etchison group, owners of the reversionary rights, insist that since there was no paying production on or before April 25, 1955, and for six months thereafter, the minerals have reverted to them. The owners of the term mineral interests contend that the shut-in gas well provision in the lease of July 29th, not only kept the *lease* alive but *their mineral interests* as well since (a) the owners of the reversionary estate as exclusive lessors were agents of the term mineral owners and bound to exercise this power with the utmost fair dealing; and (b) all the parties, owners of the reversionary as well as the term mineral interests, together with Union, modified the provisions of the mineral deeds requiring paying production on or before April 25, 1955, and for six months thereafter, by virtue of (a) the shut-in gas well provision in the lease of July 29th;

and (b), the ratification of such lease by the owners of the term mineral interests.

In addition the Nueces Royalty group, recognizing, as do all the parties, that the term mineral interests would have terminated and reverted in the absence of paying production on October 25, 1955,[2] insists that completion of the first gas well, capable of producing in paying quantities on October 23, 1955, actual production being delayed until pipe line connections were had five months later, operated to continue their mineral grants beyond the crucial date fixed in these grants; citing Bain v. Strance, Tex.Civ. App., 256 S.W.2d 208; Upshaw v. Norsworthy, Tex.Civ.App., 267 S.W.2d 566; Cowden v. General Crude Oil Co., Tex. Civ.App., 217 S.W.2d 109. While there has been some contrariety of opinion as to the meaning of "production," "discovery" and "paying production" so as to keep a lease alive beyond its termination, the greater weight, and certainly the most recent, of the Texas cases, Sellers v. Breidenbach, Tex.Civ.App., 300 S. W.2d 178, 179,[3] reject the "West Virginia" theory of the cases cited by the Nueces Royalty group.

Sellers v. Breidenbach is squarely in point here. There the significant date as to paying production in the mineral deed was June 1, 1946.[4] The Court assumed that two gas wells had been completed prior to June 1, 1946, but were shut-in and not actually producing, although they were capable of "paying production" then and at all subsequent times. The Court said:

"Under the record here there was no production whatever from the premises. There were two completed shut-in gas wells capable of producing gas but absolutely not producing. The parties could have

placed *in their royalty deed* a shut-in gas well provision, if they had desired to do so, but *we find no such provision in this deed.* They could have provided that the *royalty deed* would be continued in effect if a well capable of producing was completed on the premises, if they had so desired, but they did not do so. 'Paying production' does not mean the completion of a well *capable of producing,* it means a well which is *actually producing* on the significant date."

Counsel seek to distinguish the Sellers-Breidenbach case by an affidavit that they have searched the records and that the *lease* there did not contain, as here, a shut-in gas well provision. But, as disclosed by the emphasized portions of the foregoing quotation from the opinion, it is the *mineral deed, not the lease,* that should have contained a provision securing to the term mineral owners the benefit of a shut-in gas well provision. I hold, therefore, that the term mineral grants terminated and reverted to the Parmelee-Etchison group unless they were extended by (a) the trusted agency theory because they, the grantors, retained the exclusive right to lease; or (b) a modification of the terms of the mineral grants by the subsequent ratification of the lease by the owners of the term mineral grants, so that the shut-in gas well provision inured to their benefit.

### The Agency Theory.

■■ Ordinarily, of course, the relationship between the reversioners and the term grantee is that of tenants in common and no agency relationship exists in the absence of authorization.[5] Although there was no express provision that the reversioners would have the *exclusive* right to lease, simply a pro-

---

2. Clark v. Holchak, 152 Tex. 26, 254 S.W. 2d 101.

3. See also Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339; Morrison v. Swaim, Tex.Civ.App., 220 S.W.2d 493; Holchak v. Clark, Tex.Civ. App., 284 S.W.2d 399.

4. The deed actually provided for termination if there was "no paying production * * * on or before December 1, 1945, and for six months thereafter, that this grant shall become null and void * * *".

5. Willson v. Superior Oil Company, Tex. Civ.App., 274 S.W.2d 947.

vision that it would not be necessary for the Grantee to join in any lease, the parties treated the provision as a grant of exclusive right to lease; and the reversionary owners faithfully accounted to the term mineral owners for their share of the bonus money. Of course, an oil and gas lease by one co-tenant is subject to ratification by another but apparently neither the term mineral owners nor the reversioners thought this was necessary. Indeed Union took the lease from the Parmelee-Etchison group and Stovall alone. The ratification seems to have originated just prior to and right after the drilling activities, probably because Union understandably wished to eliminate any question as to the exclusive right of the Parmelee-Etchison-Stovall groups to lease.

█ It is true that where the exclusive right to lease is reserved there is a duty of utmost fair dealing on the part of the grantee. Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543. But here there is no semblance of unfair dealing; or of collusion between Union and the reversioners to delay actual paying production beyond October 25, 1955. Quite the contrary is to be implied from the facts claimed on brief or by affidavit. Must a grantee surrender his right to claim termination of· a mineral estate granted for a limited term simply because he reserved the exclusive right to lease? Utmost fair dealing would call for leasing upon the most advantageous terms obtainable, among other things securing the highest possible bonus. Conceivably a lease carrying a shut-in provision would be of more value to a lessee than one without such a provision and therefore would command a better bonus in which the term mineral owners would share. In the absence of some allegation of unfair dealing, presumably the term mineral owners here shared in that ad-

vantage when they were paid their share of the bonus money.

█ There is nothing in the pleadings, the affidavits or the requirement for utmost fair dealing of an exclusive agent for leasing that suggests that the owner of the reversionary right must surrender his property right upon termination of the term of the grant. The shut-in gas well provision was quite common in oil, gas and mineral leases by the time this one was executed; so, not only was there nothing unfair about it but, as pointed out above, its inclusion may have commanded a better bonus for the lease; indeed without it there might have been no lease at all; so development was had which *could* have resulted in perfecting the mineral grants before October 25, 1955.

I hold, therefore, that the fact that the reversionary owners were exclusive agents for leasing, or acted as such, did not extend the term mineral grants beyond the period provided in the deeds.

The Theory That the Termination Date Was Modified by the Lease and Its Ratification by the Owners of the Term Mineral Interests.

This contention is based upon the holdings in two Texas cases, Southland Royalty Company v. Humble Oil & Refining Company, 151 Tex. 324, 249 S.W.2d 914, 916, and Spradley v. Finley, Tex., 302 S.W.2d 409. In the Southland case *all* the owners, term mineral interests and reversionary, joined in a single lease of adjoining lands as a whole. Two producing wells were completed well *before the expiration of the term mineral grants* but not upon the particular tracts in which Southland owned a mineral interest. The Texas Supreme Court held that "when the parties executed the lease in 1932 they *intended* to create a unitized lease with all the usual incidents and legal consequences thereof;" [6] and

---

**6.** The court cited and followed: Parker v. Parker, Tex.Civ.App., 144 S.W.2d 303, and French v. George, Tex.Civ.App., 159 S.W.2d 566, in which all the owners of lands had executed a joint lease on their

lands, as though they were one ownership; Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, where 21 owners of various tracts, executed *a unitized lease* by separate *contemporaneous* instru-

that production on any of the unitized lands operated to extend the 20 year term specified in the mineral deeds.

In Spradley v. Finley, supra, the owners of term mineral interests and the reversioners executed separate, but *contemporaneous* leases, each containing a provision authorizing unitization with other lands. There was production on some of the unitized lands *before expiration of the term mineral grants*. The Court followed the rule announced in the Southland case and held that production on any pooled lands operated to extend the term mineral grant which, like those involved here, were to terminate if oil, gas or other minerals were not being produced on or from the described lands at the expiration of the term of years provided. In both the Southland and Spradley cases, the court held that the parties had, by joint or contemporaneous leases, changed the provisions of prior term mineral grants requiring production on or from "said lands" so that production from any of the pooled lands before expiration of the term mineral grants would inure to the benefit of the grantees and prevent reversion of their interests.

But the Southland and Spradley cases are bottomed upon the mutual *agreement* of the reversioners and the owners of the term mineral interests. In those cases and the ones upon which they are based (footnote 6, supra), all the parties to the joint or contemporaneous leases *surrendered* something and *received* something. They surrendered their right to claim *all*

royalties from their particular land; and they received a right to share *proportionately* in the lands of the other ·parties to the leases. There was consideration. There was *agreement*.

█ Here the Parmelee-Etchison group did agree *with Union* that shut-in gas well rentals would keep the *lease* alive. They did *not agree* with the owners of the term mineral interests, or with anyone else, that the shut-in gas well payments would prolong or extend the term *mineral grants*. The ex parte ratifications by the owners of the term mineral interests, more than a year later, could not and did not create an agreement by the Parmelee-Etchison group to extend the term mineral grants, or that "shut-in" payments would constitute "paying production" *within the meaning of the mineral grants*. The Parmelee-Etchison group has done nothing at any time to indicate a relinquishment of their right to claim a reversion in the event of "no paying production on said land" upon the termination date. As the court said in Sellers v. Breidenbach, supra: "The parties could have placed in their royalty deed a shut-in gas well provision, if they had desired to do so, but we find no such provision in this deed."

The motions of the Parmelee-Etchison group for summary judgment will, therefore, be granted as against the Nueces Royalty and the Scott groups. The motions of the latter groups for summary judgment will be overruled.

ments, each of which was identical as to terms and described all the tracts of land in the unitized block; and Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43, 46, approving the rule announced in Veal v. Thomason, that a lease jointly executed by owners of two or more tracts, owned

in severalty, with provision for pooling or sharing the royalties, has the effect of vesting all the lessors, at least during the life of the lease, "with joint ownership of the royalty earned from all the land in such block."