ARCHER COUNTY ET AL v. C. R. WEBB ET AL.

No. A-7490. Decided June 22, 1960.
Rehearing Overruled October 19, 1960.
(338 S.W. 2d Series 435)

*Paul O. Wylie,* County Attorney for Archer County, *Tom Sealy, F. H. Pannill, Stubbeman, McRae, Sealy* and *Laughlin,* of Midland, for Fredda Fay Durham and Dorothy Turner Scharbauer, and Fred Turner, Jr. *Carl Jones* and *Joe D. Meroney,* of Midland, *Rayburn L. Foster, Harry D. Turner,* both of Bartlesville, Okla., for Phillips Petroleum Company, petitioners.

*Houston Smith,* of Ozona, *Neill, Blanks, Lewis & Glenn R. Lewis* of San Angelo, for C. R. Webb et al, respondents.

MR. CHIEF JUSTICE HICKMAN delivered the opinion of the Court.

This is in effect two suits in one. Archer County, Fred Turner, Jr., and Juliette Turner, as trustees for Dorothy Scarbauer, and Fay Durham, hereinafter called petitioners, sued respondents, C. R. Webb and others trustees of the Shannon West Texas Memorial Hospital and of the Margaret A. Shannon Estate, in trespass to try title and for a declaratory judgment establishing the continued existence of a term royalty interest in League 3, Crockett County, Texas. Phillips Petroleum Company, hereinafter called Phillips, and Fred Turner, Jr., sued the same defendants in trespass to try title and for a declaratory judgment establishing the continued existence of an oil and gas lease covering 202 acres of land in League 3, Crockett County, Texas. The trial court held that the royalty interest of petitioners subsisted to the extent that it pertained to the 202-acre tract under lease to Phillips and Turner. It further held that the lease owned by Phillips and Turner remained in effect. The Court of Civil Appeals affirmed the judgment of the trial court insofar as it held that the oil and gas lease remained in effect, but reversed and rendered that part of the judgment maintain-

ing in effect the royalty interest in the 202 acres, holding that all rights under the royalty deed under which petitioners claimed had reverted to the respondents. 326 S.W. 2d 250.

The somewhat complicated facts are recited in detail in the opinion of the Court of Civil Appeals. We think a brief statement of the facts is sufficient to disclose how the law questions presented here arose. On May 7, 1929, Margaret A. Shannon, owner in fee simple of a league of land in Crockett County, known as Survey 3, executed a deed to James E. Ferguson, conveying:

"* * * an undivided one-half interest in and to all oil and gas royalty that may be produced under oil and gas leases outstanding or to be hereinafter outstanding on the aforesaid lands, or any part thereof, for the full term of fifteen (15) years from this date, or so long as oil or gas shall be produced from said premises, or any part thereof in commercially paying quantities * * * .

"* * * *

"If no commercially paying oil or gas be produced from aforesaid lands within fifteen years, this conveyance to become null and void."

By mesne conveyances all the interests acquired by Mr. Fergusion under that deed passed to the petitioners herein.

Margaret A. Shannon died testate on December 13, 1931. By her will all of her interest in League 3 passed to respondents as trustees of her estate and of the Shannon West Texas Memorial Hospital. On April 24, 1940, respondents, as lessors, executed to R. G. Carr an oil and gas lease covering 202 acres of League 3. The lease was for a primary term of ten years "and as long thereafter as oil, gas or other mineral is produced from said land hereunder." The lease provided for payment of shut-in gas well royalty of $50.00 per well per year where gas from a well producing gas only was not sold or used. Carr assigned his interest under the lease to Phillips, which in turn assigned an interest in 40 acres thereof to Fred Turner, Jr. Delay rentals were paid to respondents sufficient to keep the lease in force until April 24, 1944. Phillips and Turner, however, completed a well on the 40 acres as a potential producer on September 24, 1943. Subsequently, during a period from September 15, 1948, to January 5, 1949, gas from this well was produced and sold, but except during that period no gas has been produced from

the well. Since the completion of the well, Phillips and Turner have annually tendered payment of the shut-in gas well royalty provided for in the lease to the respondents, all of which tenders, except one made by Turner in 1943, were refused.

There are two applications for writ of error before us. The application of Archer County and those claiming under it will be considered first. By it we are called upon to review the holding of the Court of Civil Appeals that all of the royalty interest in League 3 had reverted to respondents, the Shannon trustees.

■ The first question presented is whether the terms of the royalty deed, which provide for the continuation of the grantees' interest after the original 15-year term as long "as oil or gas shall be produced from said premises, or any part thereof in commercially paying quantities," have been met. The deed does not define "production in commercially paying quantities;" in the absence of such definition, and considering the language alone, that expression must be construed as requiring actual production in commercially paying quantities and not merely the completion of a well capable of producing. Garcia v. King, 139 Texas 578, 164 S.W. 2d 509; Freeman v. Magnolia Petroleum Co., 141 Texas 274, 171 S.W. 2d 339; Sellers v. Breidenbach, 300 S.W. 2d 178, er. ref. The facts of the case last cited are strikingly similar to those in the instant case, and it was held " 'Paying production' does not mean the completion of a well capable of producing, it means a well which is actually producing on the significant date." Applying that rule to the instant case, it must be held that the royalty interest conveyed, considering alone the terms of the deed under which petitioners claim, terminated on May 7, 1944.

■ We consider next whether the terms of the royalty deed were modified by the execution of the oil and gas lease above mentioned. The primary term of the lease was for ten years "and as long thereafter as oil, gas or other mineral is produced from said land hereunder." But the lease provided that "where gas from a well producing gas only is not sold or used, Lessee may pay as royalty $50.00 per well per year, and upon such payment it will be considered that gas is being produced within the meaning of paragraph 2 hereof." Petitioners contend that respondents, by executing this lease, effected a modification of the royalty deed so that payment of the shut-in gas well royalty would not only keep the lease in force, but it would also maintain the royalty interest in force.

To our minds, the language of the lease does not either expressly or by implication extend the term of the royalty deed. Under the express provision of the lease, payment of the shut-in gas well royalty is considered "production" "within the meaning of paragraph 2 hereof." Paragraph 2 of the lease prescribes its own duration, and the effect of the provision quoted is merely to extend the term of the lease and not the term of the royalty deed. There is no provision in the royalty deed which extend its term by the payment of shut-in gas well royalty, and as held in Union Producing Co. v. Scott, 173 F. Supp. 361, affirmed in 267 F. 2d 469, "It is the mineral deed, not the lease which should have contained the provision securing to the term mineral owners the benefits of the shut-in gas well provision."

Petitioners place much reliance upon the cases of Southland Royalty Co. v. Humble Oil & Refining Co., 151 Texas 324, 249 S.W. 2d 914, and Spradley v. Finley, 157 Texas 260, 302 S.W. 2d 409. There is a clear distinction between those cases and the instant one. In each of those cases all the parties, including the owners of term royalty interests, executed a lease or leases unitizing the premises covered with other premises, the effect of which was to enlarge by agreement the area of the premises covered by the royalty deed from which production could be obtained to continue the term royalty interests in effect.

Our conclusion is that the term of the royalty deed was not extended beyond the fifteen years by the execution of the oil and gas lease.

■ Petitioners also contend that respondents are estopped to assert that their royalty interest expired by its own terms. They base that contention, as we understand it, upon the proposition that respondent's claim of benefits under the lease to the exclusion of petitioners for whom they acted in a fiduciary capacity in executing the lease is unfair. We can discover no unfairness to the term royalty owners in the execution of the oil and gas lease by respondents. No injustice resulted to them. In fact, the execution of the lease could well have resulted in great benefit to the petitioners. Had the well actually produced oil or gas in commercial quantities, the effect would have been to extend their royalty deed. But petitioners argue that to uphold the execution by the respondents of the type of lease here involved would be to open the door to all kinds of fraud and collusion between lessors and lessees, for the purpose of terminating the interests of term owners. In our view, the holding that the execution of

the lease in this case was not a breach of any duty owing to petitioners does not condone any fraudulent act or open the door to fraud.

As noted above, respondents filed an application for writ of error. That application raises the single point that the Court of Civil Appeals erred in affirming the judgment of the trial court that the oil and gas lease executed by respondents to Carr, and subsequently assigned to Phillips and Turner, had been maintained in effect. Their contention is based on these facts: After completing a potentially producing gas well in September, 1943, Phillips and Turner made annual tenders to respondents of the shut-in gas well royalty in 1943, 1944, 1945, 1946, and 1947. The tender made in 1943 was accepted; the others were rejected. On September 2, 1948, Phillips and Turner made a tender of the shut-in gas well royalty for the period from September 25, 1948, to September 25, 1949, which was also rejected. For a period beginning September 15, 1948, and continuing through January 5, 1949, however, gas from the well was produced and sold. Tenders of the royalty on the sales were made to respondents, but they were also rejected. No further tenders of any type were made until September, 1949, when Phillips and turner again tendered the $50.00 shut-in gas well royalty provided for in the lease. That tender was likewise refused.

As we understand respondents' position, it is that the effect of the tender made on September 2, 1948, must be determined by the facts as they existed on September 25, 1948. Since there was production in commercially paying quantities at that time, respondents argue, that tender was a nullity. They contend that the lease was held by actual production from September 15, 1948, through January 5, 1949, and when actual production ceased, Phillips and Turner were obligated to resume payment of the shut-in gas well royalty within sixty days. There having been no such tender within that period, respondents maintain that the lease terminated. In our view, Phillips and Turner were excused from the performance of any duty to pay shut-in gas well royalty within sixty days after the termination of production that may have been imposed upon them by the lease because respondents had repudiated the lease and denied Phillips' and Turner's right and title under it by refusing to accept previous tenders of shut-in gas well royalty. The repudiation by respondents of the lease was evidence not only by their refusal to accept the tenders of shut-in gas well royalty, but also by correspondence disclosed in the record, which it is unneces-

sary to set out here. That repudiation made further tenders of shut-in gas well royalty unnecessary. Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Texas 565, 160 S.W. 2d 509.

Our conclusion is that the courts below correctly held that the oil and gas lease had not terminated.

In summary, we hold that the term royalty deed expired at the termination of the fifteen-year period provided therein, and that the oil and gas lease still subsists. The result is that the judgment of the Court of Civil Appeals is affirmed.

ASSOCIATE JUSTICE WALKER not sitting.

Opinion delivered June 22, 1960.

JUSTICE HAMILTON, joined by JUSTICES SMITH AND GREENHILL dissenting on MOTION FOR REHEARING.

The dissenting opinion which was handed down in this cause on June 22, 1960, is withdrawn, and the following is substituted therefor:

I respectfully dissent from the majority opinion in so far as it holds that payment of shut-in gas well royalty did not serve to extend the term royalty beyond its fixed term.

In arriving at an answer to the above question, it is necessary to construe the royalty deed and the oil and gas lease togethr, because the interest conveyed by the royalty deed is contained in the oil and gas lease. We must go to the oil and gas lease to find out what the royalty is. The royalty deed does not define "production," nor does it define "royalty." The lease sets out specifically of what the royalty payable under the lease consists, and in defining royalty it also defines production as it applies to a producing gas well from which gas is not being sold or used. The deed recites an agreement to convey

"an undivided ½ interest in and *to all oil or gas royalty* that may be paid under oil and gas leases or development work * * * *."

and that the interest is to be

"subject to oil and gas leases now outstanding or that may may be *hereinafter outstanding* on the aforesaid land or any part

thereof; said conveyance limited to 15 years, *plus production period.*" (Our emphasis.)

The lease recites:

"The royalties to be paid Lessore are: \* \* \* where gas from a well producing gas only is not sold or used, Lessee may pay as royalty $50.00 per well per year, and upon such payment it will be considered that gas is being produced within the meaning of paragraph 2 hereof; \* \* \*."

Paragraph 2 referred to provides:

"Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called 'primary term') and as long thereafter as oil or gas or other mineral is produced from said land hereunder."

The majority opinion construes the reference in the royalty provision to paragraph 2 as having the effect of restricting the definition of production to the lease itself to the exclusion of any outstanding term royalty interest. I do not think that such construction necessarily follows. All the royalty interest owned by petitioner is contained within this lease and of whatever royalty is provided therein the petitioners own an undivided one-half for a period of fifteen years *"plus production period."* The royalty provision itself defines the production period in so far as gas not being sold or used from a producing well is concerned. The reference to paragraph 2 is merely to emphasize what the parties meant by this substitute production. They made it clear that it was such a production as would extend the lease beyond its primary term and that the two provisions would not be in conflict. Petitioners bought an interest in the royalty under this lease for fifteen years "plus the production period." Petitioners received and were without question entitled to their part of the royalty paid prior to the end of the fifteen-year term. Morriss v. First National Bank of Mission, San Antonio Court of Civil Appeals, 1952, 249 S.W. 2d 269, n.r.e., wherein it was held that a shut-in gas well payment is a *royalty on production* and that the holder of a nonparticipating royalty interest is entitled to his fractional part thereof. Generally a royalty deed or a royalty reservation does not specify what kind of lease the one holding the leasing rights is to make. All that a royalty owner has is the right to participate in whatever royalty is provided for in any lease.

The question before us is an open one. The only authority the majority opinion cites for its holding on this question is the case of Union Producing Company v. Scott, 173 Fed. Supp. 361, affirmed in 267 Fed. 2d 469. That opinion is based squarely on Sellers v. Breidenbach, (Texas Civ. App.) 300 S.W. 2d 178, writ refused. Quoting from the Union Producing Company opinion:

"Sellers v. Breidenbach is squarely in point here. * * * The Court said: 'Under the record here there was no production whatever from the premises. There were two completed shut-in gas wells capable of producing gas but absolutely not producing. The parties could have placed *in their royalty* deed a shut-in gas well provision, if they had desired to do so, but *we find no such provision in this deed.* They could have provided that the *royalty deed* would be continued in effect if a well capable of producing was completed on the premises, if they had so desired, but they did not do so. "Paying production" does not mean the completion of a well *capable of producing*, it means a well which is *actually producing* on the significant date.' "

The only question that case decided was whether or not shut-in gas wells capable of producing gas but absolutely not producing was sufficient to prevent the termination of a term royalty. There was no shut-in gas well royalty provision in the lease in the Briedenbach case, and the opinion of the court does not undertake to pass on such provision in an oil and gas lease. The statement that "the parties could have placed in their royalty deed a shut-in gas well provision if they had desired to do so" indicates that if the royalty deed had such a provision the interest would not have terminated while it was paid. This is not tantamount to saying that if the lease had contained such provision the results would not have been the same.

The Sellers case simply held that the term royalty terminated where "Under the record * * * there was no production *whatever* from the premises." (Our emphasis.) It is no authority for the proposition that the payment of shut-in gas well royalty provided in a lease will not prevent the termination of term royalty. The Union Producing Company case stands alone in reaching such a conclusion. Under the circumstances we are not bound to follow it, and we ought not to do so.

With the single exception of the pooling cases, reversioners, under the majority opinion, can execute leases which define any set of circumstances as production and the effect of such lease provisions will be to extend the oil and gas lease but not to

extend term interests. To so hold is to express a judicial policy against term interests for it requires the draftsman of the royalty deed to anticipate and seek to cover all of the various contractual provisions for substitute production which the lessee and lessor may, at some time in the future, agree upon. Term interests will necessarily be prejudiced thereby because the lesseee, by reason of lease definitions of production, is freed of the most effective incentive to accomplish actual production and certainly may be tempted to operate in such a fashion that the lease will continue but the term interests will expire. Purely from a policy standpoint, as well as a legal one, we submit that the majority opinion reaches an incorrect result.

We cannot escape the conclusion that as a matter of law and aside from questions of policy, a term royalty deed must be construed together with the oil and gas lease executed by the lessor and covering the royalty interest. Only the lease gives meaning to the royalty interest. Without the lease, the royalty is valueless. Each of the parties to the deed—both reversioners and term owners alike—necessarily contemplate that one or more leases will be executed.

A lease being within the contemplation of all parties, is it illogical to construe the two together? Is it illogical to look to the lease for definitions of production? Is it illogical to give the term interest owner the benefit of the definition of "production" that the lessor, who contracts both for himself and for the term interest owner, has accepted? This Court has twice held that the lease must be considered along with the term deeds. Southland Royalty Company v. Humble Oil & Refining Company, 151 Texas 324, 249 S.W. 2d 914, 1952; Spradley v. Finley, 157 Texas 260, 302 S.W. 2d 409, 1957. Within the last few months, it has refused a writ of error in a third case, Williamson v. Federal Land Bank of Houston, Texas Civ. App., 1959, 326 S.W. 2d 560, error refused, n.r.e., in which the Texarkana Court said:

"We hold the trial court did not err in granting appellee's motion for summary judgment because the royalty clause reserved in the 1935 deed in question *should be construed in the light of, and together with, the subsequent instruments hereinabove referred to* all of which changed and modified the application of the original condition precedent with regard to production of oil, gas and minerals from 'sail land' * * * ." (Emphasis added.)

The effect of the majority opinion when considered with

the Southland, Spradley and Williamson cases is that the Texas courts must consider lease provisions in pooling cases, but may not do so in shut-in royalty cases. A term owner with pooled production survives; a term owner with shut-in production does not. No tenable distinction for the purposes of this cases can be drawn between the two types of production, yet under the majority opinion they have exactly opposite effects.

The majority seeks to distinguish the Southland and Spradley decisions on the grounds that in those cases agreements existed to enlarge the area covered by the term deeds. The opinions, however, lead to a fair inference that the first any of the parties heard of any "agreement" was when the opinions of this Court were handed down. The record in the Spradley case in particular shows there was no contention that there was any agreement in fact. The opinion of the Court of Civil Appeals (294 S.W. 2d 750) shows that the two term owners individually executed *separate leases* to W. H. Oberthier on July 31, 1945, and May 9, 1945. The reversioner executed a third lease to a different lessee on August 13, 1945. Different lessees and different times—yet modification and agreement followed as a matter of law, since all parties had agreed (although with different lessees) that pooled production would constitute production from the leased premises.

Would a different result have followed if the interests had been royalty interests and only Spradley, the reversioner, had executed a lease with a pooling provision? This was the precise question decided in Williamson v. Federal Land Bank of Houston, in which this Court refused a writ, n.r.e.

No agreement in fact was made between the term owners and reversioners in any of these cases. No unitization was accomplished by simply executing the leases. Production under the term deeds was accomplished *by the unilateral act of the lessee* of pooling pursuant to lease provisions authorizing pooling. The identical situation is presented here where the lessee completes a well and, as authorized by the lease, makes payments of shut-in royalty in lieu of actually producing the well.

It is my conclusion that where a well capable of producing gas in commercial quantities is shut in and no gas is being sold or used therefrom, payment of royalty on the shut-in well constitutes "production" so as to continue a term royalty in effect beyond its fixed term. Since the precise question before us is one of first impression and not governed by any authoritative

decision by the courts of this state, it seems that this court should give great weight to the decisions of the courts of sister states on the identical question, together with the opinions of reputable writers on the subject of oil and gas. In Louisiana all royalty interests are subject to prescription upon ten years of nonuse, and hence are similar to term interests in common law jurisdiction. Louisiana holds that payment of shut-in royalty is the equivalent of production, having the effect of interrupting or suspending prescription. LeBlanc v. Haynesville Mercantile Co., 230 La. 299, 88 So. 2d 377. The same principle of law has been forecast by an eminent Texas authority on oil and gas, Lee Jones, Jr., in an article entitled "Non-participating Royalty" in 26 Texas Law Review, pp. 569-583, where it said:

"Many exasperating questions have arisen and will continue to arise with respect to completion dates and the character of production necessary to satisfy and 'perpetuate' term-royalty grants and reservations. In this connection, it is suggested that the payment of per-well royalty on a shut-in gas well would be sufficient to 'perpetuate' or extend a term-royalty interest, since such payment is in effect a monetary substitute for production."

In discussing the cases of Sellers v. Breidenbach, supra, and Panhandle Eastern Pipe Line Co. v. Issacson, 255 Fed. 2d 669, 10th Cir., 1958, Howard Williamson and Charles Meyers, in their recent work (1959) "Oil and Gas Law," Sec. 334.5, p. 150, have the following to say:

"Neither opinion deals with what we regard as the crucial question with respect to shut-in wells. In our judgment, shut-in royalty is the equivalent of production. When such royalty is paid by a lessee to a lessor, the well is deemed to be a producing well for purposes of the thereafter clause of the lease, under the shut-in gas well lease clause. The same effect should be given to shut-in royalty in respect to the thereafter clause of a term instrument. If the term interest is a mineral interest, and both the reversioner and the term owner have signed the lease, they have agreed that payment of shut-in royalty will cause a shut-in well to be deemed a producing well. Similarly, a mineral owner, subject to an outstanding royalty, who has executed a lease with a shut-in royalty clause has agreed that production exists on the land when a royalty is paid on a shut-in well. If this payment of shut-in royalty is production for purposes of the lease, it should be regarded as production for purposes of of the term interest."

I would hold, then that the payment of the shut-in royalty by lessee is such production as would prevent the termination of the term royalty of petitioners, and would affirm the judgment of the trial court.

Opinion delivered October 19, 1960.

Rehearing overruled October 19, 1960.