MITCHELL ENERGY CORPORATION
et al., Appellants,

v.

William A. BLAKLEY, Appellee.

No. 17856.

Court of Civil Appeals of Texas,
Fort Worth.

Dec. 8, 1977.

Rehearing Denied Jan. 12, 1978.

Smith & Fulton, Vinson, Elkins, Searls, Connally & Smith, Houston, Cantey, Hanger, Gooch, Munn & Collins and Stephen A. Madsen and R. Daniel Settle, Fort Worth, for appellants.

Law, Snakard, Brown & Gambill and Robert M. Randolph, Fort Worth, for appellee.

OPINION

HUGHES, Justice.

Lessee, GM&A Gas Products Plant, Inc., and its assignor, Mitchell Energy Corp., appeal from a summary judgment holding for lessor, William A. Blakley, declaring an oil and gas lease terminated for failure to make timely payment of shut-in gas royalty and ordering them to account for all gas and condensate oil produced and sold by them since the date lessor purchased the land covered by the lease. They also appeal from that portion of the judgment, based on a jury verdict, awarding Blakley $144,-704.85, which amount, less certain offsets, represents (a) the jury's award of fair market value of gas and condensate oil produced and (b) punitive damages for appellants' failure to account for additional gas and condensate oil produced from the well. Lessor alleged the lease had terminated because shut-in royalty payments were erroneously commenced one day late. Alternatively, he alleged a previous lessee's sale of gas from the well to the driller for use in drilling another well under the lease was a sale which came within the actual royalty clause and was not within the free-use provision of the lease which grants the lessee free use of gas for all operations under the lease. Lessor sought an accounting and later amended his pleadings to allege that

appellants, in their accounting, intentionally understated the amounts of gas and condensate oil produced by the well.

We reverse the trial court's judgment, render judgment in part that the lease did not terminate for failure of timely shut-in gas royalty payments, and remand the balance of the case to the trial court for consolidation with the severed cause number 141–37202–76.

The trial court's summary judgment was rendered against Mitchell Energy Corporation, successor in interest of Mitchell & Mitchell Properties, Inc., (hereafter collectively called Mitchell); GM&A Gas Products Plant, Inc.; and two other defendants, Humble Oil & Refining Company and Phillips Petroleum Company, Humble and Phillips have not appealed.

The initial background of this case precedes the involvement of Wm. A. Blakley and Mitchell and GM&A.

## EXECUTION OF OIL AND GAS LEASE AND OPERATIONS UNDER THE LEASE

Walter C. Pool, Jr., and The Fort Worth National Bank, independent executors and trustees under the wills of W. C. and Alma L. Pool, as lessor, executed an oil and gas lease covering 2,341.66 acres in Tarrant and Denton Counties, Texas, to Humble as lessee, for a primary term of ten years. The lease was dated March 11, 1955, and effective April 1, 1955.

Humble paid annual delay rentals to maintain the lease without drilling operations until the end of the primary term. Humble agreed to assign the lease to Phillips, and Phillips began operations for drilling the Pool "B" well on the west 320 acres of the Pool lease. Phillips contracted with Jack Grace Drilling Company to drill the "B" well. When the "B" well was completed, it was shut in for lack of a pipeline connection. On June 2, 1965, Humble assigned the lease to Phillips as to the west 320 acres. In August, 1965, Phillips recorded a declaration, pooling the west 320 acres of the Pool lease with 320 acres out of other leases held by Phillips and creating a 640-acre gas unit.

In January, 1966, Phillips employed Grace to drill the Pool "D" well on other acreage covered by the lease. Phillips then sold gas produced from the "B" well to Grace for use in drilling the "D" well from February 3, 1966, to March 4, 1966. The record shows that the gross value (less tax) of the gas used for drilling was $592.88.

Humble made the first few shut-in gas royalty payments of $195.14 per month on the "B" well to The Fort Worth National Bank, using March 21, 1965, as the completion date and due date. When Phillips began making the shut-in payments, it continued to use the 21st as the due date.

## PURCHASE OF POOL LAND BY BLAKLEY

On November 21, 1966, Blakley purchased the Pool Land. On March 21, 1967, the Bank returned the shut-in payment to Phillips for the period March 21 through April 21, 1967. By letter dated that same day (March 21, 1967) Blakley wrote Phillips:

"My legal advice is that you no longer have any interest in the oil and gas minerals by virtue of the original lease on this land. Under the most extenuating construction favorable to you no circumstances could cover any more than the 320 acres involved in the 640 acre Pool B # 1.

"You will therefore be advised that it is my position that you do not have any interest in the oil and gas minerals on this property and any tender made or attempted to be made by you will not serve to  .  .  .  acquire such interest."

## ASSIGNMENTS OF PORTIONS OF OIL AND GAS LEASE TO APPELLANTS, MITCHELL AND GM&A

On December 2, 1968, and retroactively effective from November 1, 1968, Phillips assigned to Mitchell those portions of the leases constituting the 640-acre gas unit, including the west 320 acres of the Pool lease. A pipeline was completed to the "B"

well. Production began in September, 1969. The "B" well was tied into a gathering line owned by Southwestern Gas Pipeline, Inc., which bought gas from the "B" well under a contract with GM&A and collected gas from four other Mitchell wells in the area. On January 30, 1970, Mitchell assigned its interest to GM&A and made the assignment retroactively effective as of the date of the first production from the well on the gas unit.

## FILING OF ORIGINAL ACTION BY BLAKLEY

On October 3, 1969, Blakley filed this action against Mitchell & Mitchell Properties, Inc., Phillips, Humble, and Southwestern Gas Pipeline, Inc., seeking to cancel the lease on the ground of bad-faith pooling. Later GM&A Gas Products Plant, Inc. was also named a defendant. Ten individuals who were the alleged lessors of the leases purportedly pooled by Phillips with the Blakley acreage were also named as defendants. The trial court sustained pleas of privilege by the ten individuals and Southwestern.

On June 25, 1973, Blakley filed his fourth amended original petition, alleging the lease had terminated on the additional grounds that there had been a failure of timely payment of shut-in gas royalty because (a) "HUMBLE erroneously commenced making the shut-in gas royalty payments for a period described as commencing on March 21, 1965, rather than on March 20, 1965" and consequently no "royalty was ever paid or tendered . . . for the period March 20, 1965 to March 21, 1965"; and (b) the sale of gas to Grace for use in drilling the "D" well changed the shut-in royalty due date to the fourth of the month, as of March 4, 1966.

On February 17, 1975, the trial court rendered an interlocutory summary judgment, granting Blakley's motion for summary judgment and reciting that it found the defendants' motion for summary judgment moot. Therein the court declared that the lease "expired and terminated under its terms prior to September 1, 1969, for fail-

ure to make timely payments of shut-in gas royalty; . . . ." and declared that the lease assignment and declaration of pooling had also terminated.

The court's final judgment, rendered April 27, 1976, made the interlocutory summary judgment final. The final judgment carried forward the conditional waiver contained in the interlocutory summary judgment, reciting that Blakley had "waived his right to trial of the bad faith pooling issues, conditioned upon finality of this summary judgment terminating the lease for failure to make timely shut-in gas royalty payments; . . . ."

Upon agreement of the parties, the trial court severed the bad-faith pooling issues, and defendants, Humble and Phillips, were eliminated from the remainder of the trial below.

Mitchell and GM&A filed a joint accounting, to which Blakley objected on the ground that the accounting fraudulently understated the amounts of gas and condensate oil produced and converted by them. The trial court ordered a separate trial on those issues, which were tried before a jury.

The trial court's final judgment incorporated the terms of the interlocutory summary judgment, and, based on the jury's answers to special issues, rendered judgment for Blakley against appellants, jointly and severally, for the following amounts, less certain offsets:

(1) The sum of $1,600.38 as the fair market value of gas not accounted for by defendants; and

(2) The sum of $116,500.00 as exemplary damages for understating the volume of gas intentionally for the purpose of reducing the payments owed to plaintiff; and

(3) The sum of $1,470.59 as the fair market value of condensate oil not accounted for by defendants; and

(4) The sum of $15,000.00 as exemplary damages for understating the volume of condensate oil intentionally for the purpose of reducing the payments owed to plaintiff; and

(5) The sum of $39,327.36 as the fair market value of gas and condensate oil accounted for by defendants, less the sums of $2,843.71 paid in taxes and refunds and $7,941.19 paid as expenses of operating the well, for a net figure of $28,542.46; and

(6) Legal interest at six per cent per annum on the net amounts recovered by plaintiff under item (5) next preceding, from the time each month that gas and condensate oil were produced and converted by said defendants until date of this judgment. (At date of judgment these amounts totalled $6,982.42); and

(7) Interest at nine per cent per annum on the total sum of items (1) through (6), from date of judgment until paid.

The court also awarded appellants the following amounts as set off:

$9,750.00 as the fair market value of the recoverable casing, $11,981.00 for the tubing, and $3,660.00 for leasehold equipment.

Blakley received a joint and several judgment in the net total sum of $144,704.85, with interest at nine per cent per annum.

Appellants, by point of error no. 1 contend that the trial court erred in rendering summary judgment that the lease expired for failure of timely payments of shut-in gas royalty. Point of error no. 2 avers that the trial court's action was error because the Grace Drilling sale did not change the due date for such payments to the fourth day of each month.

Blakley alleged that the sale, from February 3, 1966 through March 4, 1966, of gas from the "B" well to Grace Drilling for use in drilling the "D" well, suspended the payment of shut-in royalties during that period. Appellants argue that this transaction was within the free-use provision of the lease. Blakley contends it was a "sale" which required the payment of actual royalties. When the well was again shut in on March 4, 1966, Blakley says a new due date for payment of shut-in gas royalties was established—the fourth of each month.

The pertinent terms of the lease are as follows:

2. Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date, called "primary term" and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder.

3. The royalties to be paid by lessee are: (a) on oil, one-eighth of that produced and saved from said land . . . (b) on gas, including casing head gas or other gaseous substance, produced from said land and sold or used off the premises or for the extraction of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; while there is a gas well on this lease or on acreage pooled therewith, but gas is not being sold or used, Lessee may pay as royalty, on or before ninety (90) days after the date on which said well is shut in and thereafter at monthly intervals a sum equal to one-twelfth (1/12) of the amount of the annual rental payable in lieu of drilling operations during the primary term on the number of acres subject to this lease at the time such payment is made, and if such payment is made or tendered, this lease shall not terminate and it will be considered that gas is being produced from this lease in paying quantities; and (c) . . . Lessee shall have free use of oil, gas, coal and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used.

■ The issue before us is whether the sale of gas by Phillips to the drilling contractor for operations under the lease comes within the free-use and shut-in gas royalty clauses instead of the actual royalty provision for gas "sold or used off the premises." We expressly do not address the issue whether intermittent off-premises sales re-

sult in changes in the shut-in royalty due date.

Appellants argue that the construction urged by Blakley ignores the second part of the free-use clause which states that the royalty is to be computed after deducting the amount of gas used.

Blakley cites as indirect support for his position *Munger v. Waggoner*, 260 S.W. 696 (Tex.Civ.App.—Amarillo 1924, writ ref'd). In *Munger* the court held that under a similar free-use provision lessee could exchange crude oil produced on the premises for an equal amount of fuel oil. The court noted that this exchange was beneficial to the lessor because the substituted fuel was a more efficient source of energy and its use reduced the amount of free crude oil used under the free-use provision of the lease. Blakley points out that the court in *Munger* also expressly stated that it was not confronted with a situation in which the oil was traded for "derricks or horses, or mules, boilers, and engines . . . ." Blakley categorizes these items as suitable for use in drilling operations and construes this language as support for his contention that the rule in *Munger* must be limited strictly to the facts of that case. Blakley argues that a sale or trade for items other than a more efficient, and hence more economical fuel would be prohibited by a proper application of *Munger*.

We disagree with Blakley's interpretation of the language in *Munger*. Although Blakley argues it is significant that "derricks or horses . . ." are suitable for use in drilling operations, we think the crucial distinction suggested by *Munger* is that neither the gas nor the "derricks or horses" received in exchange would have been used exclusively for the drilling operations under the lease. In the case at bar the gas was not used in connection with other operations. It is undisputed that the gas was used by Grace solely in drilling operations under the lease.

By its terms, the lease continued after the primary term only if there was actual production (or constructive production in the form of shut-in royalty payments.) To bolster his argument that the actual royalty clause rather than the shut-in royalty clause applies, Blakley attempts to argue that the Grace Drilling sale constituted actual production under the terms of the lease.

We agree with Blakley that the lease continued in effect only so long as there was production in paying quantities (that is, sufficient to pay the lessee a profit, even if small, over operating and marketing expenses, although it might never repay the cost of drilling the well.) *Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509 (1942). And where it is shown that a small profit has been realized from the well's operation, the well is producing in paying quantities. *Morgan v. Fox*, 536 S.W.2d 644, 650 (Tex. Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.).

Blakley argues that it is shown that the lessee made such a profit. In support, Blakley states only that the terms of the drilling contract required the purchaser to bear all costs of running the line from the Pool "B" well to the Pool "D" well and that the purchaser paid Phillips for the gas. Blakley argues that it is "empirical" that where there is a sale of gas, there is a market for that gas.

As we construe the lease, however, this argument is irrelevant. The royalty provision does not impose a royalty on gas sold for use on the premises for operations under the lease. In our view the second clause of the free-use provision expressly precludes the payment of royalty on any gas used in the drilling operations—even on gas sold by the lessee to the driller for that purpose.

Appellants cite *Tidewater Associated Oil Co. v. Clemens*, 123 S.W.2d 780 (Tex.Civ. App.—Texarkana 1938, no writ) as support for their position that the lessee was not required to pay royalty on the gas sold to Grace. In *Tidewater* the lease permitted lessee free use of gas for operations under the lease. The wells on the lease were producing only oil and wet (casinghead) gas. There was no well producing dry gas (gas only). The lessee sold the wet gas to a

casinghead gas plant which extracted the gasoline and returned the residue gas to the lessee for use in his operations. The lessor argues that he was entitled to receive, in kind, ⅛ of the residue gas because the residue gas returned was part of the consideration the lessee received from the sale. The court held that the lessor's contentions did not take into account the lessee's right to free use of gas for his operations and that the sales contract with the plant merely protected lessee's right to free use of the gas after the gasoline had been extracted from it.

Blakley attempts to distinguish *Tidewater* because the free-use clause in that case lacked the second provision found here ("and the royalty on oil, gas and coal shall be computed after deducting any so used.")

Blakley also argues that the second clause of the free-use provision merely provides the method for calculating the royalty when gas is used by the lessee and that it does not permit free use of gas sold to others for operations under the lease.

We see no reason to interpret the second clause as a bar to lessee's free use in this case. We do not find the secondary authorities cited by Blakley persuasive. The language quoted concerning the effect of intermittent production on the shut-in royalty anniversary date does not refer either to sales for use in operations under the lease or to the free-use provision. See Comments, 24 Tex.L.Rev. 478, 482 (1942); Walker, *Developments in the Law of Oil and Gas in Texas During the War Years—A Resume*, 25 Tex.L.Rev. 1, 22 (1946), and 3 H. Williams & C. Meyers, Oil & Gas Law § 633.5 at 469–70 (1975). We construe the second clause of the free-use provision as permitting the sale of gas by lessee to driller in this case.

Appellants' third point is that the trial court erred in rendering summary judgment that the lease expired for failure of timely payments of shut-in gas royalty because the payments were timely commenced and continued.

Blakley's fourth amended original petition alleged that "HUMBLE erroneously commenced making the shut-in gas royalty payments for a period described as commencing on March 21, 1965, rather than on March 20, 1965," and consequently "no . . royalty was ever paid or tendered . . . for the period March 20, 1965 to March 21, 1965."

But in response to Phillips' requests for admissions Blakley had previously admitted the following:

"10. Humble . . . after the shuting-in [sic] of the Pool 'B–1' Well, immediately after its completion, timely commenced payment of shut-in gas royalties to the persons authorized to receive the same in accordance with the terms of the Oil, Gas and Mineral Lease of March 11, 1955.

"11. All shut-in gas royalty payments made by Humble . . . and Phillips . . . prior to the acquisition of the property made the basis of this lawsuit by Wm. A. Blakley, were timely made to the persons authorized to receive the same under the terms of the Oil, Gas and Mineral Lease dated March 11, 1955."

Blakley further admitted:

"9. But for the fact that the Pool 'B–1' Well was placed in production, . . it would be correct to state that prior to the acquisition by Wm. A. Blakley of the property made the basis of this lawsuit, each shut-in royalty payment which Phillips . . . undertook to make was timely made to the persons authorized to receive the same . . . . However, said well was placed in production on February 3, 1966, and was thereafter shut in again on March 4, 1966. . . . When the well was shut in again on March 4, 1966, shut-in royalty payments were due and owing monthly, and a new monthly anniversary date came into being. For the period prior to acquisition by Wm. A. Blakley of the property made the basis of this lawsuit, and only during the period of such acquisition . . . shut-in royalty payments were made by Phillips . . . far enough in advance of each of the old monthly anniversary dates that, when such payments are made

applicable to the new monthly anniversary date arising after the well was shut in on March 4, 1966, such payments by Phillips . . . prior to November 21, 1966, nevertheless were timely made."

By our holding on point of error no. 2 we have rejected Blakley's contention that the sale to Grace Drilling changed the shut-in royalty due date to the fourth of the month.

■ Thus the only question before us under point of error no. 3 is whether payments after November 21, 1966 (the date Blakley purchased the land), and up to March 21, 1967 (the date Blakley repudiated the lease) were timely made or tendered with respect to the due date of the 21st. We need not look beyond March 21, 1967, since tenders of shut-in gas well royalty are unnecessary after repudiation of the lease. *Archer County v. Webb*, 161 Tex. 210, 338 S.W.2d 435 (1960).

■ Using the 21st as the monthly due date, there is no question as to the timeliness of the payments or tenders. The lease requires that payments be "mailed or delivered . . . on or before the date of payment." In his brief Blakley admits that monthly shut-in royalty payments were delivered prior to the 21st of each month for the period from November 21, 1966, through April 21, 1967.

We sustain appellants' third point and hold that the shut-in gas payments were timely commenced and continued. Having sustained appellants' first three points, it is unnecessary for us to consider points of error nos. 4 through 8. In connection with the position (which we have rejected) that the Grace sale changed the shut-in royalty due date, these points raise the questions of ratification, acknowledgment, novation and repudiation by Blakley. Nor need we consider point of error no. 9 which contains an assertion that the trial court erred in its rendering summary judgment because there were genuine issues of fact material to those questions.

## CONCLUSION

We reverse that portion of the trial court's judgment declaring that the lease expired prior to September 1, 1969, for failure to make timely payments of shut-in royalty and render judgment that the lease is valid as against the allegations that it terminated because of failure to make timely shut-in gas royalty payments.

Appellants have asked, in an alternative prayer for relief, that we also declare the issue of the alleged bad-faith pooling moot. However, the trial of those allegations below was waived, conditioned upon the finality of the summary judgment, and those issues were severed. The severance of the bad-faith pooling issues, and our holding on the summary judgment issues, require that the remainder of the case concerning Blakley's objections to the accounting and the alleged understatement of production be remanded for trial and consolidated with the bad-faith pooling action against all defendants. Accordingly, we expressly refrain from consideration of appellants' points of error nos. 10 through 23 relating to the jury trial held on the issues raised by Blakley's objections to appellants' accounting.

We reverse the trial court's judgment and render judgment in part that the lease did not terminate for failure of timely shut-in gas payments.

We remand the balance of the case to the trial court and order that it be consolidated with severed cause number 141–37202–76.