**MORRISON et ux. v. SWAIM et al.**
No. 2714.

Court of Civil Appeals of Texas. Eastland.
April 22, 1949.

Rehearing Denied May 13, 1949.

Lyndsay D. Hawkins, of Breckenridge, and Tom M. Miller, of Graham, for appellants.

John H. Banks and Tom Davis, both of Haskell, and Aubrey G. Alexander, of Fort Worth, for appellees.

494

COLLINGS, Justice.

This suit was filed in the trial court by appellants, Tom Morrison and wife, against A. B. Swaim and others, appellees herein, seeking to declare an oil and gas lease terminated by its own limitations for non production after the expiration of the primary term and to remove the cloud from appellants' title cast thereon by said lease. Upon a jury finding to the effect that there had been no cessation of production of oil from a well drilled upon the premises in question, a judgment was entered against appellants perpetuating the lease. From such judgment this appeal is brought.

Appellants alleged the execution of an oil and gas lease dated April 25, 1941, providing for a primary term of five years from the date thereof. The habendum clause of the lease is as follows: "To have and to hold the same for a term of five years from this date, hereinafter referred to as primary term, and as long thereafter as oil or gas or casinghead gas, or either or any of them, is produced therefrom, or as much longer thereafter as the lessee in good faith shall conduct drilling operations thereon and should production result from such operations, this lease shall remain in full force and effect as long as oil or gas or casinghead gas shall be produced therefrom."

Appellants alleged that on April 16, 1946, before expiration of the primary term on April 25, 1946, an oil well was drilled in as a producer of oil on said lease. It was further alleged by appellants that from the date of completion of the well on April 16th until the middle or latter part of August, 1946, no oil or gas or casinghead gas was produced from said lease and that no drilling operations were conducted thereon. Appellants here contend that such alleged failure to produce oil automatically lapsed and terminated the lease, and that such lapsation and termination took place on or about April 25, 1946.

Special Issue No. 1 of the court's charge and the answer of the jury thereto was as follows: "Do you find from a preponderance of the evidence that the Morrison well No. 2 involved herein between April 25, 1946 and in August, 1946, when Gratex took oil from such well, did not produce oil without cessation? Answer: It did produce oil without cessation."

■ It is contended by appellants in Point 1 that the evidence established conclusively and as a matter of law that after the expiration of the primary term of the lease involved herein, there was no such production as, under the provisions of the lease, was necessary to the continuation of the term thereof, and that according to the terms of the lease, as provided in the habendum clause hereinabove set out, the lease automatically terminated on or about April 25, 1946. It seems to be well settled in this State that where an oil and gas lease provides for a primary term and "as long thereafter as oil or gas is produced therefrom" the production of oil or gas at the time of the expiration of the fixed term is regarded as a condition precedent to the continuation of the lease, and that upon cessation of such production after termination of the primary term, the lease automatically terminates. Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 137 A.L.R. 1032; W. T. Waggoner Estate v. Sigler Oil Company, 118 Tex. 509, 19 S.W.2d 27. The strictness of this rule has been relaxed in several cases where there was only temporary cessation.

■ In effect, the answer to special issue No. 1 above finds that oil was being produced from the lease at the expiration of the primary term and then continued without cessation until some time in August, after which it is admitted that oil was produced from the well in question in paying quantities. The first question confronting us in connection with appellants' point 1 is, was the evidence herein sufficient to support such jury finding that there was production of oil as contemplated by the lease at the time of the expiration of the primary term on April 25, 1946. The evidence, in our opinion, is conclusive that there was not such production. According to the testimony, oil was discovered on April 16th but it has been held in this State that the words "discovered" and "production" are not synonymous. Texas Pacific Coal & Oil Co. v. Bratton, Tex.Civ.App., 239 S.W. 688. Production to extend a lease beyond its primary term, must be in paying quantities. Bouldin v. Gulf Production Co., Tex.Civ.

App., 5 S.W.2d 1019; Heard v. Nichols, \Tex.Com.App., 293 S.W. 805; Leon v. Gulf Production Co., Tex.Civ.App., 35 S. W.2d 1101; Ryan v. Kent, Tex.Com.App., 36 S.W.2d 1007. The well in question did not occupy the status of a producing oil well at the time of the expiration of the primary term. No oil had been produced from the well on that date. A little oil was produced from the well between April 26th and May 11th, but the first oil in any appreciable amount to be taken from the well was on May 14th and 15th when under a potential test taken by the Railroad Commission, the well made thirty-one barrels in twenty-four hours. This was about twenty days after the expiration of the primary term and was too late to effect an extension of the lease. The judgment, therefore, cannot stand upon the jury verdict and if upheld, it must be on some other ground.

Appellees contend that the judgment should be upheld regardless of the sufficiency of the evidence to support the jury finding that there was production without cessation.

They insist that the lease was continued in effect by drilling operations conducted in good faith which were in progress at the end of the primary term and resulted in production of oil. As we interpret the lease there were two ways in which it might be extended. The first is set out in the language "*and* as long thereafter as oil * * * is produced therefrom," and the second is contained in the words immediately following those just quoted, to wit: "*or* as *much longer* thereafter as the lessee in good faith shall conduct drilling operations thereon." The lease further provides: "*and* should production result from such operations, this lease shall remain in full force and effect *as long as* oil * * * shall be produced therefrom." (Italics ours). In its usual meaning, the word "or" is a disjunctive participle that indicates a choice between two alternatives generally corresponding to "either" or "either this or that." That is the meaning which we think was here intended. Either production in paying quantities or drilling operations in good faith would be effective to extend the term of the lease. We cannot agree with the idea advanced by appellants that the only drilling operations contemplated by the lease which might preserve the life of the lease are drilling operations which follow cessation of production once had.

Appellants, in their pleadings, alleged a lack of both production and drilling operations on the lease at and after the expiration of the primary term. Appellees denied these allegations. The burden was on appellants to establish the lack of production and also the lack of drilling operations in good faith. Each was an essential element of their right to recover. Guleke v. Humble Oil & Refining Co., Tex. Civ.App., 126 S.W.2d 38; Miller v. St. Joseph's 55 Oil Ass'n, Tex.Civ.App., 278 S.W. 457; Hall v. McClesky, Tex.Civ.App., 228 S.W. 1004. An issue on the lack of production was submitted, but no issue was submitted or requested to be submitted on the lack of drilling operations. These issues were appellants' issues. A favorable determination of both was necessary to sustain appellants' right or ground of recovery. By failing to request the submission of the issue on drilling operations, appellants, in effect, waived a jury finding on that question and the trial court was empowered to determine same. When no finding is made or requested to be made by the trial court, it will be presumed that the issue was found by the trial court in such manner as to support the judgment if there is evidence to support such finding. Cochran v. Wool Growers Central Storage Co., 140 Tex. 184, 166 S.W.2d 904; Vanover v. Henwood, 136 Tex. 348, 150 S.W.2d 785; Rule 279, Texas Rules of Civil Procedure; Minchen v. Vernor's Ginger Ale Co., Tex. Civ.App., 198 S.W.2d 613; Miller v. St. Joseph's 55 Oil Ass'n., supra; Wichita Falls & Oklahoma R. Co. v. Pepper, 134 Tex. 360, 135 S.W.2d 79; Bigelow v. Rupp, Tex.Civ. App., 192 S.W.2d 791. The material evidence on the question of such drilling operations is as follows. Swaim testified, in substance:

"The oil sand was found in Morrison Well No. 2 on April 16, 1946; on April 17th he cleaned out the well and washed the sand and built a fence around the pit to keep the cattle away; on April 18th he ran

the bailer and bailed out all the sediment that had settled in the hole; on April 19th he went to Breckenridge and got dynamite and shot the well; on April 20th he ran the bailer and bailed sand out of the well and went to Abilene to see the Railroad Commission; on April 21st (was Easter) he did not work; on April 22nd he bailed and washed the well and measured the fluid and found 360 feet of fluid in the hole; on April 23rd it rained hard and he ran the bailer to see how much fluid was in the hole and to get the sand out; on April 24th he cleaned out the well and went to Breckenridge and got 5-3/16 lining, took it back to the well and got ready to run it; on April 25th he washed and bailed the hole to get all of the sand cuttings out of the hole; on April 26th he bailed until twelve and started pulling 8½ in. casing getting the well ready to pump; on April 27th, 28th, 29th, 30th, & May 1st he pulled the 8 & 10 in. casing; on May 2nd he laid down the sheer pole that you run pipe on; on May 3rd he was getting the tubing ready to run in the well and on May 4th he ran 833 feet of tubing with a working barrel on the bottom like a pump; on May 5th he ran the rods that the traveling valve connects onto that lifts the oil; on May 6th he went to Breckenridge and got more rods and finished running the rods on May 7th; on May 9th he cleaned out a tank to move to the lease, and moved it to the lease, and cleaned off the ground, and cleaned out the bottom of the tank; on May 10th he went to Throckmorton and got 8 sacks of cement to fix a hole in the bottom of the tank, and on May 11th he cemented the tank; on May 12th and 13th he let the cement set; and on May 14th and 15th the Railroad Commission ran the potential test, request for which he had made several days before; on May 16th it rained too hard to get out to the well; on May 17th tonged (screwed up) the 7 in. casing which had been left in the well; on May 18th, 22nd, 25th, 26th and 27th he moved equipment away from the well to get room to set pumping equipment; on May 28th, 29th and 30th he let the mast down so as to move the mast and rig out of the way to set pumping equipment, engine and power; on June 1st he went after the engine, and on June 2nd he rigged up and cleaned out a place, and dug a place to put the timbers to install the engine; on June 3rd he went to Breckenridge after an engine and did not get one; on June 5th he went to Olney looking for an engine; on June 6th he went to Breckenridge looking about pipe; on June 7th he went to Abilene to see an engine; on June 8th he made arrangements with Mr. Cross for power to pump the well with; on June 9th he looked for the power but couldn't find it and on June 10th he loaded the power and brought it back that night, and on June 11th he hauled the power to the location, unloaded it, and on June 12th dug out for sills on which to hold the power in place, and on June 13th set, or installed, the power to get ready to pump oil; on June 14th he went to Breckenridge and found a Fairbanks Morse engine, got it and brought it back to the well on June 15th and unloaded it, and on June 16th he set the engine; on June 17th, 18th, and 19th he built a power house; and on June 20th he went after a power belt and brought it back to the lease; and on June 21st connected up and got ready to pump, and on June 22nd started pumping; on June 26th and 27th he fixed up the old pit for BS which had been washed out; then on July 1st water broke in and he pumped water on July 1st, 2nd, 3rd, 4th, 5th and 6th, and ½ day on July 7th and oil started; on July 16th water broke in again and he dug a ditch out to the pit and mixed mud and put it around the casing to shut off the water, and on July 18th he tonged the pipe and shut off the water and talked to Gratex about taking oil; and on August 8th the Gratex came and hauled 53 barrels of oil, and since he has regularly run oil into the storage."

\* \* \* \* \* \*

"The Appellant Morrison testified "that A. B. Swaim got the tank about the time the well came in; that he knew that the casing was being taken out of the well in April; that he knew a tank was erected to put oil in; that he knew power was installed 15 or 30 days after the well came in; and that it is still there; that he knew they had put an engine there to pump the oil after April 16th and before August; and he knew that Swaim was down there in-

stalling the stuff and working on the well after April 26th and before August."

The above evidence, as we view it, falls short of conclusively establishing the lack of drilling operations in good faith at and after the expiration of the primary term. Since no issue was submitted or requested thereon, it is therefore presumed that the trial court found the existence of such drilling operation in good faith, that is, that the issue was found by the trial court in such manner as to support the judgment. Appellants admit and the evidence is undisputed that the well in question has been producing oil continuously since August 8, 1946, and further, that this production resulted from drilling operations conducted by appellees. These facts, together with the presumed finding that drilling operations in good faith by appellees were in progress at the time and after the expiration of the primary term, are all that was needed to extend the term of the lease.

For the reasons stated, the judgment of the trial court is affirmed.