**ICE BROTHERS, INC., Appellant,**

v.

**Fred BANNOWSKY, Appellee.**

No. 08–91–00325–CV.

Court of Appeals of Texas,
El Paso.

Sept. 9, 1992.

Rehearing Overruled Oct. 14, 1992.

Shane Spear, Bullock, Scott, Neisig & Owens, Midland, for appellant.

Ben Sudderth, Comanche, Martin L. Peterson, Stephenville, for appellee.

Before OSBORN, C.J., and KOEHLER and BARAJAS, JJ.

## OPINION

KOEHLER, Justice.

In a declaratory judgment action brought by Appellant seeking to have an oil, gas and mineral lease declared terminated according to its terms, Appellee filed a counterclaim against Appellant seeking damages for tortious interference with contractual relations. The trial court granted a summary judgment in Appellant's favor on the tortious interference counterclaim.

Following a jury trial and verdict on the declaratory judgment action, judgment was rendered declaring the lease in question to be in effect and awarding Appellee his attorney's fees. Both parties appeal from the respective adverse judgments. We affirm the summary judgment in Appellant's favor and reverse and render the judgment on the jury verdict rendered in Appellee's favor.

## FACTUAL BACKGROUND OF THE CONTROVERSIES

This case involves an oil, gas and mineral lease ("Braswell Lease"), dated March 15, 1978, between Maggie Brookshier, as lessor, and Braswell Oil Company, Inc., as lessee. This lease covered approximately 239 acres in Runnels County, Texas. Located on this property was only one well (Brookshier Well) which had any history of production.

The Braswell Lease was for a primary term of three years commencing from its date and was to continue "as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days." Further, in the lease, "operations" was defined as follows:

[O]perations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

The lease interest owned by Braswell was assigned to Fred Bannowsky (Bannowsky), Appellee and Cross–Appellant, in 1981. In 1983, Bannowsky assigned the Braswell Lease to Barco Industries, Inc. (Barco), retaining for himself an overriding royalty interest. Thereafter, Bannowsky sued Barco for nonpayment of a note underlying the assignment. The parties reached a settlement of the suit, as a result of which Barco, in June 1989, reassigned the lease to Bannowsky.

During this period of time, Union Texas Petroleum, Inc. (Union Texas) had been the purchaser of the natural gas produced by the well. Union Texas last purchased gas produced by the well in September 1987 and paid out the last royalty check to Barco on October 26, 1987. Ice Brothers, Inc. (Ice), Appellant and Cross–Appellee in this appeal, learned from its investigation that Union Texas was no longer purchasing gas from the well and in fact, because of the nonproduction, Union Texas had permanently disconnected the well on June 2, 1989. Ice contacted Louise Williams, the surface title owner and royalty cotenant of the property, with reference to becoming a lessee under a new mineral lease. Ice and Williams entered into a new lease on the property on July 18, 1989, the lease providing that it "is subject to any valid and subsisting oil, gas or mineral lease or leases covering all or any part of the said land...."

Based on its contention that the Braswell Lease had terminated from lack of production for more than ninety days, Ice brought this suit for a declaratory judgment to that effect, for a temporary injunction prohibiting Bannowsky from removing any casing and equipment from the well or damaging the well and for reasonable attorney's fees. Bannowsky answered specially denying that the Braswell Lease had terminated due to the cessation of operations, alleging affirmative defenses and counterclaiming for damages resulting from the tortious interference by Ice with the rights of Bannowsky under the Braswell Lease. Ice then filed its motion for summary judgment on both its action for declaratory judgment and Bannowsky's suit for tortious interference. Following a hearing, the court granted Ice a summary judgment as to Bannowsky's counterclaim for tortious interference but denied it as to the declaratory action.

In the trial on the merits that followed, the sole issues were whether Ice had proved that there was no production of natural gas from the well after September 1987 and before August 1989 for a period of more than ninety consecutive days, and the parties' attorney's fees. In connection with the non-production question, the jury was instructed that " 'production' means actually taking gas from a well in a captive state and either placing the same in storage or marketing it." The jury answered the non-production question in the negative. In answer to the other questions, the jury found that reasonable attorney's fees for Ice would be $41,500 and for Bannowsky $14,000. As a result of the jury verdict, the court rendered judgment that the Braswell Lease was still in force and effect and had not been terminated and awarded Bannowsky his attorney's fees.

## ICE BROTHERS APPEAL

With respect to the adverse verdict and judgment on the question of non-production of gas, Ice has raised four points of error. Ice claims error by the trial court in overruling its motions for judgment notwithstanding the verdict and for new trial because it proved as a matter of law that there was no production of gas for more than ninety consecutive days (Point of Error No. One) or because the jury's negative finding on the non-production issue was against the great weight and preponderance of the evidence (Point of Error No. Two). Under its third point, Ice asserts trial court error when it admitted the testimonial evidence as to the financial condition of Lou Beal or Barco Industries, Inc. Point of Error No. Four is somewhat of a conditional point in that Ice contends that if we sustain any of the first three points of error, the trial court will have erred by awarding Bannowsky his attorney's fees.

## MATTER OF LAW CHALLENGE

In its Point of Error No. One, Ice attacks the jury's negative finding on the question of whether Ice proved by a preponderance of the evidence that there had been no production of gas for more than ninety days, contending that it had established the affirmative as a matter of law and was therefore entitled to a judgment notwithstanding the verdict. When a jury answers a question in the negative, this means that the party with the burden of proof has failed to carry that burden.

*Sterner v. Marathon Oil Company,* 767 S.W.2d 686, 690 (Tex.1989). Although often treated initially as a "no evidence" point, a contention that a fact issue has been established as a matter of law is and should be treated as a "conclusive evidence" point. *City of Dallas v. Moreau,* 718 S.W.2d 776, 778 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.); Powers & Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Texas L.Rev. 515 (1991). When the proponent of an issue attacks a jury's refusal to find in its favor, the reviewing court must, as with a "no evidence" challenge, examine the record to determine if there is any evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, oppose that which is urged as conclusive. If there is some such evidence and reasonable inferences to the contrary, that ends the inquiry since the proponent's position cannot be conclusive under that circumstance. Powers & Ratliff, supra at 523. If there is no such evidence and reasonable inferences to the contrary, the next step is to examine the record to determine whether there is enough evidence to establish the proponent's position as a matter of law. *Sterner,* 767 S.W.2d at 690; *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); Powers & Ratliff, supra at 523. If the evidence is conclusive in the latter respect, then the proponent would have been entitled to a judgment notwithstanding the verdict. *Moreau,* 718 S.W.2d at 778.

Under the foregoing standard of review, we must first examine the entire record to see if there is any evidence, including reasonable inferences, that would prove, or tend to prove, that there was at least some production of natural gas from the Brookshier Well which would satisfy the lease requirements of no cessation of operations for more than ninety consecutive days during the time period in question. The parties agree that the amount of production was irrelevant since under the definition of operations in the lease, production was not required to be in paying quantities.

■ As stated by this Court in *Riley v. Meriwether,* 780 S.W.2d 919, 923 (Tex.

App.—El Paso 1989, writ denied), "[P]roduction of a well involves actually taking oil or gas from the well in a captive state for either storing or marketing the product for sale." "Stored gas" is gas that is "produced from one formation and injected into another depleted formation near the market for purposes of temporary storage." Williams and Meyers, *Manual of Oil and Gas Terms,* 1193 (8th Ed.1991). "Marketing the product" means simply "to offer for sale" or "to sell" in a market. *The American Heritage Dictionary,* 767 (Second College Edition 1985). In order to satisfy the definitions in the instant case, there must be some evidence, direct or by reasonable inference, that first, gas was being taken from the Brookshier Well in a captive state, and second, that the gas so taken was either stored or marketed.

■ From an examination of the record, we are unable to find any positive testimony or other evidence that gas was being produced, as that term has been defined, from the Brookshier Well during the period in question. Several witnesses testified to circumstantial evidence that would at best create a reasonable inference that gas was being taken from the well in a captive state. Tommy King testified that he was at the well site just two times, both in the company of Bannowsky, the first in October 1988 and the second in May 1989. On the first occasion, the orbit valve on the wellhead was closed. When they turned it open, the well started flowing oil and lots of gas. When he returned the following May, he observed that a black plastic flow line had been hooked up in the casing below the wellhead. He believed that gas was flowing through the line because it felt cool. He observed that the black plastic line went off in an easterly direction and then turned north but did not know where it went after that. Tommy King's father, Lester King, also testified that he was on the lease one time, in July 1989, at which time, the well was dead. There were no meters or gauges on the wellhead. Although he did not know whether the well had been producing in 1988 or 1989, it was his opinion that the well had been producing because, in addition to the regular flow

line from the wellhead, it had a second black plastic line from the casing head. This line went east but he did not know how far since they did not follow it.

Another witness, Amos Keith, attested to going on the well site with Bannowsky three times, the first time in the summer of 1988 and then in March and April 1989. The well valves were closed at the time of the 1988 visit and he had no way of knowing whether there had been any production between that time and his March and April visits. He didn't look at the valves in April. He believed that the well had been producing because there was still some pressure on the wellhead. He observed a flow line which appeared to be fairly new but did not know where it went. Bannowsky testified at one point that he went on the lease at least once every thirty days on the average from November 1987 to June 1989 to check on the equipment and to see if the well was producing.[1] He opined that the well was producing, i.e. gas was flowing, because he could both hear and feel gas going through the line and the line was cold the one time he put his hand on it.

■ Neither the foregoing or any other witnesses gave positive or direct evidence that gas was being taken from the well in a captive state. At best, the testimony would create a reasonable inference to that effect or to the effect that someone was taking gas illegally. Moreover, there was no direct evidence that the gas, if being taken, was either stored or marketed. This would have to be inferred from the fact that gas was being taken, which itself was not a fact but, as we have concluded, at best a reasonable inference from evidence that the flow line was cold and vibrated on several occasions. However, this does not satisfy the definition of "production" since there must also be some independent evidence that the gas inferentially flowing through one or the other of the flow lines was being either stored or marketed. An inference does not constitute evidence in support of a proposition unless the inference is based upon facts established by direct evidence. *Roberts v. U.S. Home Corporation*, 694 S.W.2d 129, 135 (Tex.App.—San Antonio 1985, no writ). It is a long established principle that an inference cannot be drawn from facts established by another inference; i.e. an inference based on an inference. *Rounsaville v. Bullard*, 154 Tex. 260, 276 S.W.2d 791, 794 (1955). There was no direct evidence presented by Bannowsky or the other witnesses from which it could be inferred that the gas was either sold or stored. None of the witnesses, including Bannowsky, apparently felt it was important to follow the mysterious black plastic flow line from the well to its destination. We conclude that there was no evidence that there was production of gas during the period in question.

We must next determine whether the evidence presented by Ice was sufficient to establish conclusively that there was no gas production from the Brookshier Well for more than ninety consecutive days during the period. The parties agree that Union Texas was the purchaser of the gas produced by the well. There was testimony from Union Texas employees that gas ceased to be produced from the well after September 1987 and that the last royalty check was written in October 1987. Williams and Bannowsky both testified that they had received no royalty checks during the period in question. Union Texas' charts indicate that no gas passed through the well meter after September 30, 1987 and that the well was placed in tempo-

1. During direct examination, Bannowsky was asked and answered as follows:
 Q. Okay. Now, was there ever as much as sixety [sic] continuous days between November of 1987 and June of 1989 in which you did not go out there and check to determine if gas was going through that meter loop?
 A. I can't recall any time of that long a time a period that I wasn't there.

 Q. Okay.
 A. It is possible, but I don't recall it.

 . . . . .

 Q. Was there ever a period of as much as sixety [sic] days continuously that gas did not flow through that line?
 A. Not that I know of.

rary discontinue[2] status in April 1988. The well was permanently discontinued in early June 1989 by disconnecting and removing the meter. The valves and the red tag were at that time just as they had been left in April 1988. Reports filed with the Texas Railroad Commission show no production from the well after June 1988. Bannowsky's own witnesses testified that when they first went on the lease in the summer and in October of 1988, the valves on the wellhead were closed. According to Lou Beal of Barco Industries, the operator and lessee of the property, there was no production from the Brookshier Well from July 1988 to June 1989 when it reassigned the lease to Bannowsky.

We conclude from the foregoing summary that there was sufficient evidence to prove conclusively that there was no production, as the term has been defined, from the well for a period of more than ninety consecutive days from June 1988 to July 1989. Thus, Ice was entitled to a judgment notwithstanding the verdict and the trial court erred by failing to grant Ice's motion to that effect. Point of Error No. One is sustained.

Having sustained a "no evidence" point, we find it unnecessary to consider Ice's second and third points of error. With respect to Point of Error No. Four which claims error by the trial court in awarding Bannowsky his attorney's fees, the jury found reasonable attorney's fees for the parties in answer to the two questions on the subject. For Ice's attorney's fees, the jury determined that the following was the reasonable value of the services rendered in the case: $41,500 through the end of the trial; $10,000 in the event of an appeal to the Court of Appeals; $5,000 in the event application for writ of error is filed in the Supreme Court; and $2,500 in the event the Supreme Court grants the writ of error. The jury then found that $14,000 was the reasonable value of the services rendered by the attorneys representing Bannowsky. It is obvious that the trial court obtained

the two jury findings so that it would be in a position to award attorney's fees to the successful party. Since the judgment is to be reversed and rendered for Ice on the ground that the lease had terminated, it would be only equitable and just that the attorney's fees awarded to Bannowsky be set aside and that Ice be awarded its attorney's fees as determined by the jury.

## BANNOWSKY APPEAL

In his appeal, Bannowsky claims in a single point of error on his cross-appeal that the trial court erred by granting a summary judgment in Ice's favor on Bannowsky's cause of action for tortious interference with contractual relations, namely the Braswell Lease which had been reassigned to Bannowsky in June 1989. The claim here is that Ice tortiously interfered with that lease by contacting Louise Williams, by entering into a new lease with her on the same property covered by the Braswell Lease, by filing the declaratory judgment suit and by filing a *lis pendens* notice.

In reviewing a summary judgment appeal, this Court must determine whether the successful movant in the trial court carried its burden of showing that there is no genuine issue of a material fact issue and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Company, Inc.*, 690 S.W.2d 546, 548 (Tex.1985). In deciding whether or not there is a disputed fact issue precluding summary judgment, evidence favorable to the non-movant is to be taken as true, and in that connection, every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in his favor. *Nixon*, 690 S.W.2d at 548–49. If the defendant is the movant and he submits summary judgment evidence disproving at least one element of the plaintiff's case, then summary judgment should be granted. *Bradley v. Quality Service Tank Lines*, 659 S.W.2d 33, 34 (Tex.1983);

---

**2.** When a well is placed in temporary discontinue status, both valves on either side of the meter run and the valves on the meter itself are closed. The valve on the end of the meter run is then red tagged with words to the effect that the valves were not to be opened except by Union Texas employees and that the reason for the discontinue was no gas.

*Rayos v. Chrysler Credit Corporation,* 683 S.W.2d 546, 547 (Tex.App.—El Paso 1985, no writ).

 In a cause of action for tortious interference, a plaintiff must prove four elements (1) there existed a contract that was subject to interference; (2) the defendant willfully and intentionally interfered with the contractual relationship; (3) the intentional acts of the defendant were the proximate cause of the plaintiff's damages; and (4) actual damage or loss occurred. *Griffin v. Rowden,* 702 S.W.2d 692, 693 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). Because we have determined that the trial court erred by denying Ice's motion for judgment that the lease had terminated notwithstanding the verdict, there was no longer a contractual relationship between Bannowsky and the owner of the property with which Ice could have interfered. Accordingly, Bannowsky's point of error in the cross-appeal is overruled.

Judgment of the trial court in favor of Bannowsky in the declaratory judgment action is reversed and judgment rendered in Ice's favor that the Braswell Lease had terminated by reason of cessation of gas production for more than ninety consecutive days. The judgment is also reversed as to attorney's fees with judgment rendered that Ice recover of and from Bannowsky its reasonable attorney's fees: $41,500 for services in the trial court, $10,000 for services in the appeal to this Court of Appeals, $5,000 for services in the event an application for writ of error is filed in the Supreme Court, and $5,000 for services in the event the Supreme Court grants writ of error. Summary judgment granted by the court in favor of Ice on Bannowsky's tortious interference cause of action is affirmed.

OSBORN, Chief Justice, concurring.

I concur fully with results of the majority opinion. For the reasons set forth in *Montes v. Texas Employers' Insurance Association,* 779 S.W.2d 485, 487 (Tex. App.—El Paso 1989, writ denied), I do not believe there is a two-step procedure as set forth in *Sterner v. Marathon Oil Compa-*

*ny,* 767 S.W.2d 686 (Tex.1989) and *Holley v. Watts,* 629 S.W.2d 694 (Tex.1982) to determine if an issue on which a jury made a "negative" finding was established as a matter of law. I do recognize that in deciding whether the issue was established as a matter of law the Court must review all the evidence and see if there is some valid evidence contrary to the position of the party urging that the issue was established as a matter of law.