**HYDROCARBON MANAGEMENT, INC., et al., Appellants,**

v.

**TRACKER EXPLORATION, INC., et al., Appellees.**

No. 07–93–0039–CV.

Court of Appeals of Texas, Amarillo.

Aug. 23, 1993.

Rehearing Overruled Sept. 15, 1993.

Harris & Quinn, Steven B. Harris, Steven B. Harris, Jerry V. Walker, Houston, for appellants.

Peterson, Farris, Doores & Jones, Bart N. Pruitt, Amarillo, for appellees.

Before REYNOLDS, C.J., and BOYD and POFF, JJ.

BOYD, Justice.

Appellants [1] were lessees on two leases known as the "Barnes" and "Newcomer" leases located in Lipscomb County, Texas. Appellees [2] are the joint owners and lessors of the working interest in the Barnes and Newcomer leases. Contending the leases had terminated by their own terms, appellees filed suit in January 1990 seeking a declaratory judgment that title to the leasehold was vested in them. Following a bench trial, the trial court entered judgment that the two leases had terminated by their own terms in October 1989, and accordingly ordered payment of all production proceeds to appellees. For the reasons hereinafter expressed, we affirm that judgment.

The leases at issue were signed in April and May of 1976. Both leases contained a five-year primary term which expired no later than May 26, 1981. Only one well, known as the Barnes well, was completed and produced gas on the land covered by the leases, which held the leases beyond their primary terms. The events giving rise to the suit to terminate the lease occurred during the secondary term in 1989.[3]

---

1. Hydrocarbon Management, Inc. (Hydrocarbon), E.H. Blackaller, Wayman W. Buchanan, Convest Production Company, Daseke Royalty Associates, Ltd., UMC Petroleum Corporation, Headington Oil Properties, Inc., Northampton/Dasa Joint Venture, and Nuex Corporation (Northhampton).

2. Tracker Exploration, Inc., Ruth Coles Brown, Jennette Coles Stucker, Richard J. Coles, Betty Ann Arnold, Thomas Michael Roonan, Patricia Lynn Roonan, Kathleen Ann Roonan, Charles F. Roonan, and The First National Bank of Amarillo as Trustee under the Last Will and Testament of Lottie Mae Newcomer, Deceased.

3. All dates referred to hereinafter are to the year 1989, unless otherwise specified.

During the first part of 1989, Northampton served as the operator of the well. By letter dated February 23, the Texas Railroad Commission (RRC) notified Northampton that it had violated prior orders by overproducing the well's allowable. The letter instructed Northampton to shut down the well until the overproduction was made up. In response to the RRC letter, Northampton admitted that the overproduction had been for cash flow reasons, and requested that the well be allowed to produce at a reduced rate until the overproduction was made up, rather than shutting in the well. The RRC agreed to the request.

On May 25, the Barnes well stopped producing. Appellants were unable to produce any document or record showing that the well was intentionally turned off or that the purchaser refused to take production. On May 30, the RRC notified Northampton that it had violated the well's reduced rate authority, and as a result, the RRC shut-in the well. The letter was received by Northampton on June 2, seven days after the well ceased to produce.

Effective July 1, Hydrocarbon Management, Inc. (Hydrocarbon) became the successor operator to Northampton of the Barnes well. At trial, the parties stipulated that on July 2, Hydrocarbon shut-in the well for a 24–hour pressure build-up. On the following day, Hydrocarbon attempted to turn on the well and the well would not flow.

In their first fifteen points, appellants contend that the trial court's determination that the leases terminated by their own terms in October 1989, is contrary to law and the undisputed evidence in that they satisfied any of three savings provisions in the leases, thereby holding the leases. In considering appellants' contentions, we will discuss each savings clause independently of the others.

■ We note initially, as part of their cause of action upon which they bear the burden of proof, appellees must establish the lack of production, and also that the various savings provisions did not maintain the leases. *See Morrison v. Swaim*, 220 S.W.2d 493, 495 (Tex.Civ.App.—Eastland 1949, writ ref'd n.r.e.).

■ The following standards of review regarding findings of fact and conclusions of law are well established and will be applied by us in considering this appeal. On appeal, the findings of fact have the same force and dignity as a jury's verdict. *Alamo Bank of Texas v. Palacios*, 804 S.W.2d 291, 295 (Tex. App.—Corpus Christi 1991, no writ). When supported by some competent evidence, they will not be disturbed on appeal, even though they appear to be against the preponderance of the evidence, unless they are so against the overwhelming weight of the evidence as to be clearly and manifestly wrong. *Kodiak 1981 Drill. v. Delhi Gas Pipeline*, 736 S.W.2d 715, 720 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.) (cite omitted).

■ We are not bound by the trial court's conclusions of law. *Muller v. Nelson, Sherrod & Carter*, 563 S.W.2d 697, 702 (Tex.Civ. App.—Fort Worth 1978, no writ). That is, we review those conclusions *de novo*.

■ The findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing the evidence supporting a jury's answer. *Zieben v. Platt*, 786 S.W.2d 797, 799 (Tex.App.—Houston [14th Dist.] 1990, no writ). Conclusions of law drawn from findings of fact are reviewed to determine their correctness. *Id.; Mercer v. Bludworth*, 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

The evidentiary points are to be decided under the established guidelines and standards of *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951), and their progeny. Throughout this appeal, appellants challenge the legal and factual sufficiency of the evidence to support the judgment.

■ In reviewing a no evidence or legal insufficiency point, we must examine the record in the light most favorable to the finding to determine if there is any probative evidence, or reasonable inferences therefrom, which supports the finding, and we must disregard all evidence or reasonable inferences therefrom to the contrary. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401

(Tex.1981); *Garza v. Alviar,* 395 S.W.2d at 823; *Raw Hide Oil & Gas v. Maxus Exploration,* 766 S.W.2d 264, 276 (Tex.App.—Amarillo 1988, writ denied).

■ A factual insufficiency point requires us to examine the entire record to determine if there is some probative evidence to support the finding, and, if there is, we must determine whether the evidence supporting the finding is so weak or the answer so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Garza v. Alviar,* 395 S.W.2d at 823; *In re King's Estate,* 150 Tex. 662, 244 S.W.2d at 661–62; *Raw Hide Oil & Gas v. Maxus Exploration,* 766 S.W.2d at 276.

Appellants first argue that the shut-in royalty clauses of the leases maintain the leases. Relevant to our discussion of that argument are the following findings of fact and conclusions of law made by the trial court.

### Findings of Fact

13. On May 25, 1989, the Barnes well ceased production. This cessation of production was the result of mechanical difficulties with the well.

16. The Barnes well did not produce gas from May 25, 1989, until December 1989.

22. There was no production and no substitute for production from the leases from May 25, 1989, until the first week of December 1989.

### Conclusions of Law

5. The Barnes well was not "shut-in" as that term in [sic] used in the leases, at any time between May 25, 1989, and October 20, 1989.

6. The shut-in clauses contained in the leases do not operate to maintain the leases in effect.

■ The habendum clause in each lease provided they would remain in force during the primary term and "as long thereafter as oil, gas or other mineral is produced[4] from said land ..." It is the rule that a lease may be kept alive after the primary term only by production in paying quantities, or a savings clause, such as a shut-in gas well clause, drilling operations clause, or continuous operations clause. *Shown v. Getty Oil Co.,* 645 S.W.2d 555, 559 (Tex.App.—San Antonio 1982, writ ref'd); *see also Watson v. Rochmill,* 137 Tex. 565, 155 S.W.2d 783, 784 (1941); *W.T. Waggoner Estate v. Sigler Oil Co.,* 118 Tex. 509, 19 S.W.2d 27, 28–29 (1929); *Morrison v. Swaim,* 220 S.W.2d at 494.

■ A shut-in royalty clause "provides for a substitute or contractual method of production, which will maintain the lease in force and effect when a gas well is drilled *and* for which no market exists." Richard W. Hemingway, *The Law of Oil and Gas* § 6.5, at 304 (2d ed. 1983) (Hemingway). The shut-in royalty is considered constructive production and will maintain the lease if its terms are satisfied. *See Archer County v. Webb,* 326 S.W.2d 250, 255 (Tex.Civ.App.—El Paso 1959), *aff'd,* 161 Tex. 210, 338 S.W.2d 435 (1960).

■ However, contrary to appellants' argument on appeal, for a well to be main-

---

4. The word "produce" as used in the habendum clause of an oil and gas lease is synonymous with the phrase "producing in paying quantities." *Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509, 511–12 (1942). A well is producing in paying quantities if the production is sufficient to pay the lessee a profit, even small, over the operating and marketing expenses, although the cost of drilling the well may never be repaid. *Garcia v. King,* 139 Tex. 578, 164 S.W.2d at 511; *Mitchell Energy Corp. v. Blakley,* 560 S.W.2d 740, 744 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n.r.e.).

Whether an oil or gas well is producing in paying quantities is ordinarily a question of fact, but where it is shown that a small profit has been realized from the operation of the well, it may be found as a matter of law that the well is producing in paying quantities. *Skelly Oil Company v. Archer,* 163 Tex. 336, 356 S.W.2d 774, 783 (1961); *Morgan v. Fox,* 536 S.W.2d 644, 650 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.).

Whether production is in paying quantities is determined by ascertaining whether or not under all relevant circumstances, a reasonably prudent operator would continue to operate a well in the manner in which it is being operated for the purpose of making a profit and not merely for speculation. *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684 (1959); *Ballanfonte v. Kimbell,* 373 S.W.2d 119, 120 (Tex.Civ.App.—Fort Worth 1963, writ ref'd n.r.e.).

tained by the payment of shut-in royalties, it must be *capable* of producing gas in paying quantities at the time it is shut-in. *Kidd v. Hoggett,* 331 S.W.2d 515, 519 (Tex.Civ.App.— San Antonio 1959, writ ref'd n.r.e.); *Duke v. Sun Oil Company,* 320 F.2d 853, 860 (5th Cir.1963); Hemingway, § 6.5, at 304. This is true even though the shut-in royalty clause makes no mention of capacity for paying production. 3 Howard R. Williams, *Oil and Gas Law* § 632.3 (1992).

These shut-in royalty clauses provide in pertinent part:

> Where gas from any well or wells *capable of producing* gas, ... is not sold or used during or after the primary term and this lease is not otherwise maintained in effect, lessee may pay or tender as shut-in royalty to the party or parties shown by lessee's records to be entitled to receive royalties on actual production of gas ... payable annually on or before the end of each twelve-month period during which such gas is not sold or used and this lease is not otherwise maintained in force, and if such shut-in royalty is so paid or tendered and while lessee's right to pay or tender same is accruing, it shall be considered that gas is being produced in paying quantities, and this lease shall remain in force ... During any period while lessee's right to pay or tender any shut-in royalty is accruing, lessee may commence or resume operations or production and this lease shall remain in force as though shut-in royalty had been duly paid down to such commencement or resumption.

(emphasis added).

▇ In order to satisfy the shut-in royalty clause and hold the leases, it must be established that gas from a well, capable of producing gas, is not being sold or used. Thus, appellees, as a part of their burden of proof in attempting to terminate the leases, must negate the clause by establishing that the well was either not capable of producing in paying quantities, or that no market existed for the gas, or both.

The parties stipulated at trial that once the well resumed production in December 1989, it has continued to produce. Gas cannot be stored above ground, rather it must go to the gas company by pipeline or remain in the ground. Hemingway, § 6.5, at 304. In order that it may have a value, there must exist pipe lines through which it may be marketed. *Reid v. Gulf Oil Corporation,* 323 S.W.2d 107, 115 (Tex.Civ.App.—Beaumont 1959), *aff'd,* 161 Tex. 51, 337 S.W.2d 267 (1960). From the evidence of continuous production since December 1989, we can infer that a market exists for the gas produced from the Barnes well. Moreover, appellees' witness, Allen Griffin, testified that he had not seen any documentation from the gas company of their refusal to take gas, which, he said, would likely appear in the records of the previous operator of the well. Thus, because a market apparently existed for the gas, in order to negate the shut-in clause, appellees must have produced sufficient evidence that the well was not capable of producing in paying quantities.

▇ Reiterated, to permissibly shut-in a well, it must be capable of producing gas in paying quantities. *Kidd v. Hoggett,* 331 S.W.2d at 519. Producing in paying quantities means the well does not need additional equipment to operate. *Fike v. Riddle,* 677 S.W.2d 722, 725 (Tex.App.—Tyler 1984, no writ). In *Fike,* the appellants contended that the wells involved were capable of producing oil, by the installation of rods, tubing, and pumping equipment, which was sufficient to show that each well should be construed as a "producing well" within the purview of the lease in question. The court rejected this argument, holding that a "producing well" is one where the products are being produced in paying quantities and being sold in the market, without the need of further mechanical work.

In this case, the evidence established that the well stopped on May 25, and did not resume production until December. Clearly, the well was not producing in paying quantities on May 25, or May 30, the day the RRC attempted to shut-in the well. That being true, we must next determine whether the well was *capable* of producing in paying quantities.

We believe that the phrase "capable of production in paying quantities" means a well

that will produce in paying quantities if the well is turned "on," and it begins flowing, without additional equipment or repair. Conversely, a well would not be capable of producing in paying quantities if the well switch were turned "on," and the well did not flow, because of mechanical problems or because the well needs rods, tubing, or pumping equipment.

Capable has been defined as:

susceptible; comprehensive; having attributes (as physical or mental power) required for performance or accomplishment; having traits conducive to or features permitting; having general efficiency and ability; having legal right to own, enjoy, or perform.

Webster's Ninth New Collegiate Dictionary 203 (1985).

■ Hence, to be capable of producing in paying quantities, a well must have traits conducive to, *features permitting, or having attributes required to* produce an amount of production sufficient to pay the lessee a profit, even small, over the operating and marketing expenses, although the cost of drilling the well may never be repaid. *Garcia v. King,* 139 Tex. 578, 164 S.W.2d at 511. The well must be in such a condition that when it is turned "on," it begins to produce in paying quantities.

Therefore, bearing in mind the applicable standards we have set out above, we must determine if appellees sufficiently established the well's lack of capability to produce in paying quantities.

The testimony of Allen Griffin, the general manager of Hydrocarbon, illustrated that Hydrocarbon succeeded as the operator of the well July 1, that the well ceased producing on May 25, and that there were no sales from May 25 until early December of that year. He testified that he had not seen any documentation indicating the well had been intentionally turned off and, according to him, the normal operating procedure is to make a record when there is a change in the status of the well.

In July, Hydrocarbon performed various activities on the well which indicated several problems existed with the well regarding its ability to produce. For example, the well casing had holes in it and the tubing was "messed up." Hydrocarbon attempted to swab the well on July 7; however, the presence of drilling mud prevented it from going below a depth of 5,000 feet. Under the testimony, the presence of drilling mud in the tubing impedes the operation of a well.

Hydrocarbon next attempted to remove the tubing, but was unable to remove it completely because the tubing split apart during the extraction. Griffin attributed the splitting and crumbling of the tubing to a weakened condition in the pipe which was probably due to corrosion. The corrosive condition of the pipe had likely developed throughout the ten-year lifetime of the well, and had not developed in the brief period since May 25, the day the well ceased production.

Tests performed on July 30 indicated the well lost 100 barrels due to holes in the casing. According to pressure tests run on August 9, the casing had leaks, attributed to corrosion, at every interval checked for about 5,000 feet. During his testimony, Griffin agreed that not all of the holes happened between May 25 and August 9, since corrosion is a continuous process.

The evidence showed on August 1, the well was not capable of bringing gas out for sale or storage without taking the time and trouble to clear the obstructions. Additionally, on August 10, there was no tubing in the well except for a piece that had broken off at the bottom, almost 5,000 feet of casing had holes in every place tested, and the casing had slipped down the hole. Thus, had a gas company wanted to purchase gas on August 10, it could not have been delivered due to the condition of the well. Indeed, production was not resumed until December, as Hydrocarbon was attempting to fix mechanical problems in the well throughout the summer and fall of 1989.

Another witness, Greg Golladay, stated that the suit was filed because the well had not been producing since May 25. Allen Faircloth, a registered professional petroleum engineer, testified on cross-examination that the well "was unable to flow against the

sales line pressure, therefore there was [sic] no sales starting the 25th (of May)."

We believe the evidence highlighted above, considered in the light in which we must view it, is sufficient to support a conclusion that the well was not capable of producing in paying quantities on May 30, the day the well was allegedly shut-in by the RRC. This is particularly true inasmuch as the corrosion discovered in July and August could not have developed in a few days, and was most likely present in the well in May. We conclude the evidence is sufficient to support the trial court finding that the well shut down in May due to mechanical problems, and hence was not capable of producing in paying quantities, and thus could not have been shut-in by the RRC. The evidence is sufficient to support the trial court's conclusions that the leases were not maintained by operation of the shut-in well clauses.

 Appellants next argue the *force majeure* clauses maintain the leases. In doing so, they contend the RRC's letter instructing the well to be shut-in constituted an event of *force majeure*. We disagree. The *force majeure* clause provides in pertinent part:

Should lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations or from producing oil or gas under this lease by reason of scarcity of, or inability to obtain or use transportation, equipment or material, or by reason of any Federal or state law or any order, rule or regulation of governmental authority asserting jurisdiction, or otherwise by operation of force majeure (which term includes any other similar or dissimilar cause, occurrence or circumstance not within the reasonable control of lessee), then while so prevented lessee's obligation to comply with any such covenant shall be suspended and lessee's need to conduct drilling or reworking operations or to produce oil or gas shall be suspended and this lease shall remain in force so long as lessee is so prevented....

Regarding the impact of the force majeure clause, the trial court made the following findings of fact:

10. On or about February 23, 1989, the operator of the Barnes well was notified by the Railroad Commission of Texas that the Barnes well had overproduced more than twice its allowable for the month of December 1988. This notification also required that the Barnes well be shut in until the overage was made up.

11. On or about March 14, 1989, the operator of the Barnes well requested that the Railroad Commission of Texas allow the Barnes well to be produced at a reduced rate until the over-production was made up.

12. On or about March 24, 1989, the Railroad Commission of Texas notified the operator of the Barnes well that its request for a reduced rate allowable was granted, and that the well was given a reduced rate of 50% of the assigned monthly allowable until August 31, 1989. This notification stated that the failure of the operator to produce at the reduced rate would result in the cancellation of the reduced rate authority, and the well would be ordered shut in until the overage was made up.

14. On May 30, 1989, the Railroad Commission of Texas wrote a letter to the operator of the Barnes well stating that the Barnes well had produced 21,407 mcf of gas against an allowable of 16,484. This letter stated that as a result of this violation of the previous reduced rate authority, the well must be shut in. This letter was received by the operator on June 2, 1989.

15. The order from the Texas Railroad Commission was issued due to the operator's failure to comply with prior orders. The operator was not prevented from complying with the rules and regulations of the Commission. The violations resulting in the May 30, 1989, letter were within the control of the former lessees.

18. The Barnes well's inability to produce was not the result of the May 30, 1989, letter from the Railroad Commission of Texas. There was no causal connection between the Barnes well's inability to produce and the May 30, 1989, letter from the Commission.

 The purpose of a *force majeure* clause is to excuse the lessee from non-

performance of lease obligations when the non-performance is caused by circumstances beyond the reasonable control of the lessee, Hemingway, § 7.11, at 387, or when non-performance is caused by an event which is unforeseeable at the time the parties entered the contract. *Valero Transmission v. Mitchell Energy*, 743 S.W.2d 658, 663 (Tex.App.—Houston [1st Dist.] 1987, no writ); *see Gulf Oil Corp. v. F.E.R.C.*, 706 F.2d 444, 452 (3d Cir.1983), *cert. denied*, 464 U.S. 1038, 104 S.Ct. 698, 79 L.Ed.2d 164 (1984). Inasmuch as *force majeure* as an excuse for non-performance is an affirmative defense, appellants bore the burden of proof to establish that defense. *See Kodiak 1981 Drill. v. Delhi Gas Pipeline*, 736 S.W.2d at 723.

We note initially that the lease terms are controlling regarding *force majeure*, and common law rules merely fill in gaps left by the lease. *See Texas City Refining v. Conoco, Inc.*, 767 S.W.2d 183, 186 (Tex.App.—Houston [14th Dist.] 1989, writ denied). Here, the leases specifically provide for the contingency that occurred. Under the terms of the leases, rules and regulations promulgated by a governmental body constitute an excuse for non-performance. The leases define an event of *force majeure* as an "occurrence or circumstance not within the reasonable control of lessee." Thus, to be able to claim the benefit of *force majeure*, appellants must show that the RRC's action in requiring the well to be shut-in, constituted an event beyond their reasonable control.

The RRC has authority to restrict production of wells that have overproduced during a particular period of time. Specifically, the Natural Resources Code provides that, if the overproduction is not balanced during the next six-month period, the overproduced well shall be shut-in or have its production restricted to a fractional part of its monthly allowable until the production and allowable are in balance. Tex.Nat.Res.Code Ann. § 86.090(d) (Vernon 1993); *HECI Exploration Co. v. Clajon Gas Co.*, 843 S.W.2d 622, 630–31 (Tex.App.—Austin 1992, writ denied).

According to the record, the RRC sent a letter dated February 23, received February 27, notifying the operators of the Barnes well that it had overproduced more than twice its allowable in December 1988. Pursuant to § 86.090 of the Natural Resources Code, the RRC ordered the well shut-in until the overage was made up. The operator requested that the well be allowed to continue production at a reduced rate until the over-production was made up, rather than shutting in the well. In the letter, the operator stated, "[i]n anticipation of springtime shut-ins, this well was produced during December, 1988 [sic] at a rate close to the pipeline's nomination for this well for cash flow reasons." The RRC granted the operator's request to produce at a rate of 50% of the monthly allowable until August 31. In doing so, it also warned the operator that failure to produce at the reduced rate would result in cancellation of the reduced rate authority, and the shutting in of the well. The RRC's May 30 letter cancelled the reduced rate authority because of over-production in March, and ordered the well shut-in.

From the operator's statement that the well was "produced during December, 1988 [sic] at a rate close to the pipeline's nomination for this well for cash flow reasons," a reasonable trier of fact could have concluded that the operator intentionally overproduced, or at least was able to control the amount of production from the well. There was also testimony from individuals familiar with the oil and gas industry, that failure to follow the RRC guidelines, through overproduction of the well's allowable, will compel a shut-in order by the RRC.

We conclude the evidence was sufficient to support the trial court's findings. The parties are presumed to have contracted with knowledge of the law, *i.e.*, the RRC's authority to shut-in a well due to overproduction. Tex.Nat.Res.Code Ann. § 86.090(d) (Vernon 1993); *Hughes v. Cantwell*, 540 S.W.2d 742, 744–45 (Tex.Civ.App.—El Paso 1976, writ ref'd n.r.e.). The RRC gave Northampton the opportunity to limit production until the overage was made up, rather than being shut-in. Appellants' failure to comply with the RRC's requirement, which resulted in the shut-in order from the RRC, was an event within the reasonable control of appellants. That being the case, the order would

not be an event of *force majeure,* sufficient to maintain the leases.

■ Appellants' final argument under these points is that they held the leases by complying with the continuous operations provisions. They specifically challenge the sufficiency of the evidence to sustain the trial court's finding that "[d]uring the time period of August 11, 1989, until October 20, 1989, the former lessees failed to conduct mining, drilling or reworking operations on the lease."

The leases provide in pertinent part:

if production from said land ... should cease, and this lease is not otherwise maintained in force, then ... after the primary term, this lease shall not terminate if lessee commences mining, drilling or reworking operations on or before the expiration ·of sixty days from ... cessation of production.... Notwithstanding any contrary provision, if lessee commences mining, drilling or re-working operations on said land ..., this lease shall remain in force as provided by any provision hereof and for any longer time during which such operations, or any additional operations, are prosecuted with no cessation of more than sixty consecutive days....

By its terms, the sixty-day extension of time comes into play where production ceases on a well that is in the secondary term. *See Stanolind Oil & Gas Co. v. Newman Brothers Drill. Co.,* 157 Tex. 489, 305 S.W.2d 169, 172 (1957). The provision allows the lessee to maintain the leases despite a cessation of production during the secondary term by commencing mining, drilling, or reworking operations, or "any additional operations," on the leasehold, with no cessation of these operations for more than sixty consecutive days.

In its nineteenth finding of fact, the trial court found "[d]uring the time period of August 11, 1989, until October 20, 1989, the former lessees failed to conduct mining, drilling or rework operations on the lease." We must review the evidence to determine if it is sufficient to sustain that finding. Again, that review must be conducted bearing in mind the standards of review we have set out above. In that connection, appellants argue that the language in the lease, "any additional operations," is sufficiently broad to include *any* operations or activities they may have performed on the lease premises between August 11 and October 20. We disagree.

■ In the absence of express provisions to the contrary, a lessee in any oil and gas lease assumes a number of implied obligations to the lessor with reference to the operation and development of the leasehold premises. *Chandler v. Drummet,* 557 S.W.2d 313, 315 (Tex.Civ.App.—Houston [1st Dist.] 1977) (citing A.W. Walker, *The Nature of the Property Interest Created by an Oil and Gas Lease in Texas,* 11 Tex.L.Rev. 399, 401 (1933)). One such covenant is to develop the premises with reasonable diligence. *Chandler v. Drummet,* 557 S.W.2d at 315. This covenant exists in all situations where the lease is being preserved other than by the payment of delay rentals. *Id.* The implied covenants are the result of courts determining that the commitment of the leased premises to the purpose of oil and gas exploration, development, and production is a special limitation upon the lessee's estate, even though it is not expressly stated as a special limitation in the lease.

The *Chandler* court explained that the reworking provision in a lease reflects the agreement of the parties regarding what constitutes a reasonable period of time in which additional drilling operations must be undertaken after the stated contingency, whether a dry hole or cessation of production, in order to save the lease from termination by reason of the implied limitation imposed by law on the cessation of use of the estate for its intended purpose. The *Chandler* court held the lease it was considering in that case terminated by reason of the implied special limitation, inasmuch there was no language in the lease which would excuse the lessee from his obligation to develop the lease with reasonable diligence. *Chandler v. Drummet,* 557 S.W.2d at 316; *see also W.T. Waggoner Estate v. Sigler Oil Co.,* 118 Tex. 509, 19 S.W.2d at 29.

The purpose stated in the habendum clauses of the leases is for "exploring, drilling, mining and operating for and producing oil,

gas and all other minerals....” It naturally follows that the intention of the parties was for the lessees to do something that would bring about the exploration and production of oil and gas. *See Hughes v. Cantwell,* 540 S.W.2d at 744. It also follows that a lessee should not be allowed to maintain a lease without conducting activities that would cause the well to produce. *See Reid v. Gulf Oil Corporation,* 323 S.W.2d 107, 115 (Tex. Civ.App.—Beaumont 1959), *aff'd,* 161 Tex. 51, 337 S.W.2d 267 (1960).

Other terms in the continuous operations provision have been defined as requiring good faith or reasonable diligence in pursuing a producing well. For example, “commencement of operations” has been defined as requiring a bona fide intent to proceed thereafter with diligence toward the completion of a producing well. *Bell v. Mitchell Energy Corp.,* 553 S.W.2d 626, 632 (Tex.Civ. App.—Houston [1st Dist.] 1977, no writ); *Petersen v. Robinson Oil & Gas Company,* 356 S.W.2d 217, 220 (Tex.Civ.App.—Houston 1962, no writ).

Also, we have determined that the term “reworking” included “any and all actual acts, work or operations in which an ordinarily competent operator, under the same or similar circumstances, would engage in a good faith effort to cause a well or wells to produce oil or gas in paying quantities.” *Cox v. Stowers,* 786 S.W.2d 102, 105 (Tex.App.—Amarillo 1990, no writ). In that case, the lease provided,

> [i]f after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or reworking operations within sixty (60) days thereafter....

*Id.* at 103.

In sum, in interpreting language in an oil and gas lease, courts have required that activities conducted by the lessee to maintain the lease must be of a nature that would cause the well to produce. Given the implied covenant to reasonably develop, and the other requirements of conducting operations to cause the well to produce, we conclude that the term “any additional operations” only includes those operations reasonably intended to cause the well to produce.

The activities upon which appellants rely were such things as removing tubing from the well to a supply house, selling junk tubing, cleaning up and filling pits on the location with the use of a back-hoe, and hauling tubing and other material from the well for storage. It was not until October 20 that Charles Pride, an employee of appellants, “went to location, checked pressure, bled well down,” and, on October 21, “prepared for MIRU.” Appellees’ witness, Allen Griffin, testified that the type of activities that occurred between August 11 and October 20 were not actions that were more likely to make the well produce gas, or designed to re-equip the well. Allen Faircloth, a witness for appellants, admitted on cross-examination that workers simply picking up materials around the well and driving them back to the yard, and not touching the wellhead, are not activities designed to change the status of the well nor to re-equip the well to cause it to produce gas. He also testified that cleaning up the area with a backhoe is not an activity designed to change the status of the well.

Given this testimony, in the light in which we must view it, we find there is sufficient evidence to support the trial court’s finding. In summary, we hold there was sufficient evidence to support the trial court judgment that the leases had terminated under their own terms, unexcused by any savings clause. Accordingly, we overrule appellants’ first fifteen points.

In points sixteen through thirty, appellants argue that if the leases are terminated in favor of the lessors, they should be entitled to their costs for reworking the Barnes well either because they were innocent trespassers, or, in the alternative, in equity, appellees are estopped from denying that appellants are entitled to those costs.

Initially, appellants did not plead the issue of good faith trespasser. Rather, they raised it for the first time on appeal. Therefore, it is not before us for our consideration. *First Texas Prudential Ins. Co. v. Ryan,* 125 Tex. 377, 82 S.W.2d 635, 637 (1935).

Specifically, at trial appellants pled,

## D. Unjust enrichment and equitable estoppel.

After leasing the subject properties, new lessees knowingly permitted counterclaimants to rework and restore the Barnes well at substantial expense *prior* to notifying counterclaimants of their claims now stated in their petition.

In these circumstances, new lessees would be unjustly enriched if granted the relief which they seek. Alternatively, new lessees' knowing concealment of their claims of superior title prior to suit estops them from seeking the relief claimed in their petition.

In addition, appellants prayed for actual damages exceeding the jurisdictional minimum of the court, and for such other relief as may be just.

■ A party alleging the affirmative defense of equitable estoppel must plead (1) a false representation or concealment of material facts made with the intent that another party act on the false representation or silence; (2) the false representation or concealment of material facts was made by a party with knowledge of the facts; (3) the party to whom the representation was made or from whom facts were concealed was without knowledge or the means of knowledge of the real facts; and (4) detrimental reliance. *Stuebner Realty 19 v. Cravens Road 88,* 817 S.W.2d 160, 163 (Tex.App.—Houston [14th Dist.] 1991, no writ); *see Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 932 (1952); *Barfield v. Howard M. Smith Company of Amarillo,* 426 S.W.2d 834, 838 (Tex. 1968); Tex.R.Civ.P. 94.

The trial court made the following findings of fact and conclusions of law regarding equitable estoppel and unjust enrichment.

### Findings of Fact

31. The Court does not find that the lessors were induced by Tracker or Orion to declare the leases terminated or forfeited. The·Court does not find that Tracker or Orion committed any wrongful conduct toward Defendants. The Court does not find that any alleged wrongful conduct of Tracker or Orion proximately caused any damage to Defendants.

32. The Court does not find that the actions of Tracker or Orion were willful and intended to cause harm to Defendants. The Court does not find that the actions of Tracker or Orion were in reckless disregard of the rights of Defendants.

33. The Court does not find that the lessors wrongfully delayed their claims that the leases had expired. The Court does not find that the lessors induced Defendants to proceed with reworking the well by remaining silent on the issue of the validity of the leases. The Court does not find that but for the lessors' silence, defendants [sic] would not have proceeded with reworking the well.

34. The Court does not find that Tracker or Orion have been unjustly enriched. The Court does not find that Tracker or Orion knowingly concealed their claims of superior title. The Court does not find that Tracker or Orion are estopped form [sic] seeking the affirmative relief claimed in their pleadings.

37. The Court does not find that the Plaintiffs' and Third–Party Defendant's actions amounted to a fraudulent scheme to induce Defendants to rework the well and then unfairly obtain a fully operations [sic] reworked well at no expense.

38. The Court does not find that Defendants reasonably relied upon the lessors' silence in commencing reworking operations.

### Conclusions of Law

2. The Plaintiffs' claims are not barred by the doctrine of estoppel.

3. Neither Plaintiffs nor Third–Party Defendant had a legal duty to inform Defendants of future intentions to file suit to cancel the leases.

4. Defendants are not entitled to recover any of their costs incurred in reworking the Barnes well.

■ The trial court's failure to find on the various elements of appellants' affirmative defense represents a refusal by the factfinder to find, from a preponderance of the

evidence, that appellees should have been estopped. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *C. & R. Transport, Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex.1966).

When the proponent of an issue attacks a factfinder's refusal to find in its favor, our review of the evidence is to determine whether the evidence established the contrary as a matter of law. *Sterner v. Marathon Oil Co.,* 767 S.W.2d at 690; *Ice Bros., Inc. v. Bannowsky,* 840 S.W.2d 57, 60 (Tex.App.—El Paso 1992, n.w.h.); William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex.L.Rev. 515, 523 (1991) (Powers & Ratliff). Thus, we must, as with a no evidence challenge, examine the record to determine if there is any evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, oppose that which is urged as conclusive. *Ice Bros., Inc. v. Bannowsky,* 840 S.W.2d at 60. If there is some such evidence or reasonable inferences therefrom, and opposing that which is urged as conclusive, the inquiry stops. *Id.* Whatever the proponent's evidence, it cannot be conclusive if opposing evidence is in the record. Powers & Ratliff at 503. However, if we find no opposing evidence, we must then examine the record to see whether the evidence supporting the proponent's issue is established as a matter of law. *Ice Bros., Inc. v. Bannowsky,* 840 S.W.2d at 60.

There was evidence opposing appellant's contention that they established as a matter of law the contrary of the court's failure to find in their favor. It is in evidence that Orion Oil & Gas (Orion) was attempting to acquire producing properties. They discovered the Barnes well through conversations with Hydrocarbon personnel on October 10. Orion believed that appellants had violated the lease terms in not producing in paying quantities and by not satisfying the rework clause. When initially attempting to acquire the Barnes well, Orion believed that it would be necessary to drill a new well given the condition of the Barnes well. After learning of the problems that had developed with the Barnes well, Orion began in November to secure top leases which were subordinate to the leases of record, which would take priority in the event the current leases were terminated.

Orion did not interfere with Hydrocarbon's operation of the well nor did it tell Hydrocarbon anything untrue. Taking the top leases had no effect on the leases held by appellants. Also, according to Orion's evidence, because of the competitive nature of the oil and gas industry, it is not the practice to tell a company, in the position of Hydrocarbon, the intentions of Orion in seeking to acquire the top leases. There is nothing in the evidence that Orion did anything to cause the leases to terminate by their own terms.

The trial court was not persuaded that appellants carried their burden to show by a preponderance of the evidence the elements supporting equitable estoppel. This record does not support any conclusion that it reversibly erred in arriving at that conclusion. Appellants' sixteenth through thirtieth points are overruled.

In summary, all of appellants' points of error are overruled and the judgment of the trial court is affirmed.